# EXHIBIT A

STATE OF INDIANA          )                IN THE MARION SUPERIOR COURT
                          ) SS:             CIVIL DIVISION, ROOM ____
COUNTY OF MARION          )                CAUSE NO. **49D01 16 11 PL 039993**

USIC, LLC; USIC LOCATING SERVICES,         JURY DEMANDED
LLC; and LOCATE HOLDINGS, INC.

      Plaintiffs,

VS.

BRENT COFFIELD, TRAVIS DANIELS,
BRIAN HANNA, ZACH MATNEY,
ERIC MOODY, TOM ORTH, and
CONSOLIDATED INFRASTRUCTURE
GROUP, INC.

      Defendants.



FILED

NOV 09 2016

Myler Q. Eldridge
CLERK OF THE MARION CIRCUIT COURT

## Complaint

Plaintiffs allege and state the following in support of their claims for relief and causes of action against Brent Coffield, Travis Daniels, Brian Hanna, Zach Matney, Eric Moody, Tom Orth, and Consolidated Infrastructure Group, Inc. ("Defendants"):

### Parties, Jurisdiction, and Venue

1.    Plaintiff USIC, LLC ("USIC") is a limited liability company based in Indianapolis, Indiana. Its sole member is USIC Holdings, Inc. which is a Delaware C Corporation with its principal place of business in Indianapolis, Indiana.

2.    Plaintiff USIC Locating Services, LLC ("USIC Locating Services") is a limited liability company based in Indianapolis, Indiana. Its sole member is USIC, LLC as identified in Paragraph 1.

1

3.     Plaintiff Locate Holdings, Inc. ("Locate Holdings") is a Delaware corporation, with its principal place of business in Indianapolis, Indiana.

4.     Defendant Brent Coffield is a citizen of Missouri.

5.     Defendant Travis Daniels is a citizen of Iowa.

6.     Defendant Brian Hanna is a citizen of Iowa.

7.     Defendant Zach Matney is a citizen of Iowa.

8.     Defendant Eric Moody is a citizen of Nebraska.

9.     Defendant Tom Orth is a citizen of Florida.

10.    Defendant Consolidated Infrastructure Group, Inc. ("CIG") is a Delaware corporation with its principal place of business in Omaha, Nebraska.

11.    This Court has jurisdiction over the Defendants because each of them has sufficient minimum contacts with Indiana. Each Defendant engaged in tortious activity in and/or directed at Indiana.  Additionally, each Defendant either signed or, by his conduct, consented to be bound by a contractual forum-selection clause mandating jurisdiction in a court of law located in Marion County, Indiana.

**Background**

12.    USIC is the leading provider of underground utility locating and damage prevention services in the United States, performing over 60 million "locates" annually.

13.    Defendants Coffield, Daniels, Hanna, Matney, Moody, and Orth ("the Former Employees") are all former managerial employees of USIC.

14.    CIG is a competing location services provider based in Omaha, Nebraska. CIG was formed in 2016.

2

15.     In May 2016, Defendant Moody left USIC and joined CIG, performing a substantially similar role to his previous role at USIC.

16.     In September 2016, Defendants Coffield, Daniels, Hanna, Matney, and Orth also left USIC and joined CIG, performing substantially related roles compared to their previous roles at USIC.

17.     During their employment with USIC, each of the Former Employees received a copy of USIC's Handbook, containing the company's Code of Business Conduct and Electronic Communications Policies. Additionally, each of the Former Employees received training on the contents of the Handbook, including USIC's policies regarding the use and disclosure of confidential and proprietary information, and the use of USIC's email and computer systems for non-USIC business.

18.     Prior to their departures from USIC, each of the Former Employees copied, removed, transmitted, disclosed, or otherwise misappropriated confidential and trade-secret information belonging to USIC. Such information includes financial statements showing USIC's proprietary competitive pricing scheme; proprietary training methods and programs; and private customer and employee information.

19.     The Former Employees took such confidential and trade-secret information from Plaintiffs at the request and encouragement of CIG, in order to benefit CIG.

20.     Before his departure from USIC, Defendant Brian Hanna downloaded confidential and trade-secret USIC data to an external hard drive and copied it without authorization, then used professional-grade software to wipe the metadata on his computer's system in order to cover up the traces of the information he illegally copied.

US.108934916.01

21.     Defendant Hanna also has directly solicited USIC employees from his former geographical areas of oversight as a USIC employee. This includes setting up meetings with current USIC managerial employees, trying to induce them to leave USIC.

22.     Before his departure from USIC, Defendant Orth attached an external hard drive and USB flash drive to his USIC computer and downloaded thousands of confidential and trade-secret USIC files. Defendant Orth also accessed confidential, proprietary USIC training materials, which he had no legitimate reason to access other than to misappropriate such materials for use in his new position at competitor CIG. Defendant Orth also transferred USIC information through email to his personal email address, including employee and training lists.

23.     Prior to his departure from USIC, Defendant Daniels downloaded confidential and trade-secret USIC information, including proprietary financial statements detailing USIC's competitive, non-public pricing methods.

24.     Since leaving USIC, Defendant Daniels has also attempted to solicit USIC employees and customers from his former geographical areas of oversight as a USIC employee.

25.     Defendants Coffield, Matney, and Moody have each collected and distributed confidential and trade-secret USIC information, including confidential client information and personal information of USIC's locate technicians. This information was available to them only because of their high-level access at USIC.

26.     These three Defendants have also assisted and encouraged the other Defendants in soliciting USIC employees and customers.

27.     None of the confidential and trade-secret information referenced in this Complaint is publicly available or readily ascertainable by proper means by non-USIC employees.

US.108934916.01

28.     With regard to all of its confidential and trade-secret information, USIC undertakes reasonable measures to protect its secrecy, including, among other measures:

    (a)     Advising employees about the confidential nature of the information that is at issue; and

    (b)     Requiring employees to sign confidentiality agreements;

29.     During their employment with USIC, Defendants Daniels, Hanna, and Moody signed a Protective Covenants Agreement with USIC obligating them, among other things, not to use or disclose any of USIC's "Confidential Information" without authorization.

30.     True and correct copies of Defendants Daniels, Hanna, and Moody's signed Protective Covenants Agreements are attached as Exhibits A, B, and C to this Complaint and are incorporated herein.

31.     "Confidential Information," as defined by the Protective Covenants Agreement, "means information or a compilation of information, in any form (tangible or intangible), related to the Company's business that the Company has not made public or authorized for public disclosure and that is not generally known to the public through proper means."

32.     Defendants Daniels, Hanna, and Moody also attested in the Protective Covenants Agreement: "I understand that I am only authorized to access and use the Company's computers, email, or related computer systems to pursue matters that are consistent with the Company's business interests. I recognize that access or use of such systems to pursue personal business interests apart from the Company, to compete or to prepare to compete, or to otherwise knowingly undermine the Company's interests . . . is strictly prohibited and outside the scope of my authorized use of [the] Company's systems."

US.108934916.01

33.     Additionally, the Protective Covenants Agreement prohibits Defendants Daniels, Hanna, and Moody—for a period of twelve months following the termination of their employment—from knowingly, directly or indirectly, either attempting to or actually soliciting, diverting, accepting business from, or taking away a customer of USIC's that the Defendants did business with or supervised business-related activities with or about which the Defendants received Confidential Information in the two years preceding the termination of their employment with USIC.

34.     During the same twelve-month post-termination period, the Protective Covenants Agreement also prohibits Defendants Daniels, Hanna, and Moody from knowingly soliciting or encouraging, directly or indirectly, in person or through others, any USIC employee to alter his or her employment relationship with USIC to USIC's detriment. This provision is limited to USIC employees with whom the Defendants worked, over whom they had supervisory responsibilities, or about whom the Defendants gained knowledge by virtue of their employment with USIC in the two years preceding the termination of the Defendants' employment with USIC.

35.     Defendants Daniels, Hanna, and Moody further agreed, in the Protective Covenants Agreement, that for the twelve months following the termination of their employment with USIC, they would not in any capacity "provide, supervise, or manage activities or services on behalf of a Competing Business that [is] the same as or similar in function or purpose to the services" they provided to USIC during the two years preceding the end of their employment.

36.     CIG is a "Competing Business" under the terms of the Protective Covenants Agreement.

37.     Defendants Daniels, Hanna, and Moody further agreed, in the Protective Covenants Agreement, that they each would "provide [USIC] with a minimum of thirty-days' advance, written notice of the termination of my employment before I begin working for or allow my name to be associated with any other person or entity other than [USIC]."

38.     The Protective Covenants Agreement is governed exclusively by Indiana law.

39.     The Protective Covenants Agreement contains a forum-selection clause mandating exclusive venue for all disputes "arising from this Agreement" in a court located in Marion County, Indiana.

40.     CIG knew that Defendants Daniels, Hanna, and Moody had signed a Protective Covenants Agreement when CIG recruited them, and it nonetheless knowingly encouraged them to breach their Agreements.

41.     During their employment with USIC, Defendants Daniels and Hanna also signed a Non-Qualified Stock Option Agreement with Locate Holdings.

42.     True and correct copies of Defendants Daniels and Hanna's signed Non-Qualified Stock Options Agreements are attached as Exhibits D and E and are incorporated herein.

43.     Under the Stock Option Agreement, Defendants Daniels and Hanna agreed that for twelve months following their departure from USIC, they would not "directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with any business of the Company within the United States."

44.     For purposes of the Stock Option Agreement, "Company" means Locate Holdings as well as its parents, subsidiaries, joint ventures, and affiliated entities, including the other Plaintiffs.

45.     Defendants Daniels and Hanna further agreed in the Stock Option Agreement that for twelve months following their departure from USIC, they would not "directly or indirectly (a) induce or attempt to induce any employee of the Company to terminate such employment, or in any way interfere with the employee relationship between the Company and any such employee; (b) hire any person who is, or, at any time during the 18-month period immediately prior to the date of the [Defendants'] termination of employment, was, an employee of the Company; or (c) induce or attempt to induce any person having a business relationship with the Company to cease doing business with the Company or interfere materially with the relationship between any such person and the Company."

46.     The Stock Option Agreement also prohibits Defendants Daniels and Hanna from unauthorized use or disclosure of Plaintiffs' "Proprietary Information," which is defined to include, among other things, "(a) the name or address of any customer, supplier or affiliate of the Company or any information concerning the transactions or relations of any customer, supplier or affiliate of the Company or any of its shareholders; (b) any information concerning any product, service technology or procedure offered or used by the Company, or under development by or being considered for use by the Company; [and] (c) any information relating to marketing or pricing plans or methods, capital structure, or any business or strategic plans of the Company."

47.     CIG knew that Defendants Daniels and Hanna had signed a Non-Qualified Stock Option Agreement when CIG recruited them, and it nonetheless knowingly encouraged them to breach their Agreements.

US.108934916.01

### Concerted Action by Each Defendant

48.     Because of the proximity and circumstances of their departure, each of the Former Employees made a joint decision to leave USIC and jointly prepared their plan to misappropriate USIC's confidential and trade-secret information, business plans, and employees and customers.

49.     The Former Employees all knew each other and worked together during their employment at USIC.

50.     The Former Employees periodically attended meetings at USIC's headquarters in Indianapolis, and regularly participated in phone calls directed at USIC employees in Indianapolis.

51.     The subjects of these meetings and phone calls included recruiting, safety, quality, business development, pricing and financial reports, and other topics involving Plaintiffs' confidential information.

52.     At one or more meetings in Indianapolis, the Former Employees discussed USIC business matters, confidential information, and their plans to join competitor CIG and utilize USIC's confidential information.

53.     During its recruitment of the Former Employees, CIG became aware that some of the Former Employees had signed contracts with one or more of the Plaintiffs, and it actively encouraged the breach of those agreements as well the confidentiality obligations all the Former Employees owe to the Plaintiffs.

54.     Defendants acted in concert, knowingly and intentionally, in committing the unlawful acts described in this Complaint, and each Defendant is liable for the others' conduct.

US.108934916.01

55.     In support of their conspiracy, each Former Employee has unlawfully collected and distributed Plaintiffs' confidential, trade-secret information, including confidential client information and personal information of USIC's locate technicians.

56.     The Former Employees have shared such confidential and trade-secret information with one another and with CIG and agreed to use such information to USIC's detriment.

57.     Each allegation stated above is incorporated into every count below. In addition, allegations in each count are incorporated into all other counts.

### Count I: Trade Secret Misappropriation
### (Against All Defendants)

58.     Plaintiffs own trade-secret information that derives independent economic value from not being generally known to the public or to others who can obtain economic value from its disclosure or use.

59.     The Former Employees gained access to Plaintiffs' trade-secret information in the course of an employment relationship with USIC and were under an obligation to maintain the secrecy of Plaintiffs' trade-secret information obtained during their employment with USIC and thereafter.

60.     In violation of their obligations to maintain the secrecy of Plaintiffs' proprietary trade-secret information, on information and belief, each of the Defendants has used and/or disclosed Plaintiffs' trade-secret information without Plaintiffs' authorization, in an attempt to benefit themselves and Defendant CIG.

61.     Defendants conspired together, aiding and abetting one another's actions to misappropriate USIC's trade-secret information.

62.     On information and belief, Defendants have used or disclosed Plaintiffs' trade-secret information maliciously and in willful and conscious disregard of the rights of Plaintiffs.

63.     As a direct and proximate result of Defendants' willful, improper, and unlawful use and disclosure of Plaintiffs' trade-secret information, Plaintiffs have suffered and continue to be damaged, in an amount above $75,000 to be proven at trial. Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of Plaintiffs' trade-secret information.

64.     As a result of this harm, Plaintiffs seek to recover actual and exemplary damages, as well as attorney's fees, as allowed under Indiana law.

### Count II: Breach of Contract (Protective Covenants Agreements) (Against Defendants Daniels, Hanna, and Moody)

65.     The Protective Covenants Agreements are valid and enforceable contracts knowingly signed and implemented by both USIC and Defendants Daniels, Hanna, and Moody ("Signatory Defendants").

66.     The Protective Covenants Agreements are governed exclusively by Indiana law.

67.     USIC has fully performed all of its obligations and satisfied all conditions for performance under the Protective Covenants Agreements.

68.     The Signatory Defendants have materially breached their Protective Covenants Agreements by misusing and misappropriating USIC's confidential and trade-secret information; soliciting USIC customers and employees in violation of their non-solicitation obligations; working at a "Competing Business" in violation of their non-compete obligations; and failing to give the required 30-day written notice of their upcoming departure from USIC.

11

69.     On information and belief, the Signatory Defendants continue to wrongfully obtain and use Plaintiffs' confidential and trade-secret information, from which they are deriving and will continue to derive gains, profits, and advantages, many of which are not known to Plaintiffs.

70.     As a foreseeable, direct, and proximate result of the Signatory Defendants' breaches of contract, Plaintiffs have suffered irreparable injury to their rights and pecuniary damages. Plaintiffs will continue to suffer such injury, loss, and damage unless and until the Signatory Defendants are required to return Plaintiffs' confidential information and are enjoined from further breaches of the Protective Covenants Agreements.

71.     Plaintiffs are entitled to injunctive relief as well as damages, the nature and extent of which will be proven at trial.

### Count III: Breach of Contract (Non-Qualified Stock Option Agreements)
### (Against Defendants Daniels and Hanna)

72.     The Non-Qualified Stock Option Agreements are valid and enforceable contracts knowingly signed and implemented by both Locate Holdings and Defendants Daniels and Hanna.

73.     The Stock Option Agreements are governed exclusively by Delaware law.

74.     Defendants Daniels and Hanna have materially breached their Stock Option Agreements by misusing and misappropriating USIC's confidential and trade-secret information; soliciting USIC customers and employees in violation of their non-solicitation obligations; and working at a competing business in violation of their non-compete obligations.

75.     On information and belief, Defendants Daniels and Hanna continue to wrongfully obtain and use Plaintiffs' confidential and trade-secret information, from which they are deriving

12

and will continue to derive gains, profits, and advantages, many of which are not known to Plaintiffs.

76.     As a foreseeable, direct, and proximate result of the Defendants' breaches of contract, Plaintiffs have suffered irreparable injury to their rights and pecuniary damages. Plaintiffs will continue to suffer such injury, loss, and damage unless and until Defendants Daniels and Hanna are required to return Plaintiffs' confidential information and are enjoined from further breaches of the Protective Covenants Agreements.

77.     Plaintiffs are entitled to injunctive relief as well as damages, the nature and extent of which will be proven at trial.

### Count IV: Tortious Interference with Contract
### (Against Defendants Coffield, Matney, Orth, and CIG)

78.     Prior to leaving USIC (and in the case of CIG, during its recruitment of the Former Employees), Defendants Coffield, Matney, Orth, and CIG ("Non-Signatory Defendants") were aware that the Signatory Defendants had signed Protective Covenants Agreements with USIC and Stock Option Agreements with Locate Holdings, which restricted their ability to perform similar work for a competing business, solicit customers or employees from Plaintiffs, and utilize Plaintiffs' confidential and trade-secret information.

79.     Nevertheless, the Non-Signatory Defendants intentionally encouraged the Signatory Defendants to breach their agreements with USIC and Locate Holdings by, among other things, soliciting Plaintiffs' customers and employees, and utilizing Plaintiffs' confidential information without authorization to benefit their new employer, CIG.

80.     CIG became aware of the Signatory Defendants' contracts no later than October 14, 2016, when Plaintiffs' counsel notified the CEO of CIG that the Signatory Defendants had

violated their contracts with the Plaintiffs and had misappropriated confidential and trade-secret information in violation of their confidentiality obligations to the Plaintiffs.

81.     Having this indisputable knowledge as of October 14, 2016, CIG and the other Non-Signatory Defendants nonetheless continued to support and encourage the Signatory Defendants to breach their agreements.

82.     The Non-Signatory Defendants have no justification for this inducement, as he Protective Covenants Agreements and the Stock Option Agreements are valid and enforceable contracts, and the Non-Signatory Defendants' sole purpose is to try to obtain an illegal and improper competitive advantage to USIC's detriment.

83.     The Non-Signatory Defendants operated under a joint plan and conspiracy with the Signatory Defendants to leave USIC around the same time and use illegal means to compete with USIC in violation of the Signatory Defendants' contracts with Plaintiffs.

84.     The Signatory Defendants' illegal competition, solicitation, and misappropriation of Plaintiffs' confidential information has harmed Plaintiffs by diverting business and employees away, and diluting the value of Plaintiffs' trade-secret and confidential information.

85.     As a result of this harm, Plaintiffs seek to recover actual and punitive damages in an amount above $75,000 to be proven at trial.

### Count V: Pecuniary Loss under Ind. Code § 34-24-3-1
### (Against All Defendants)

86.     Prior to their departure from USIC, each of the Defendants intentionally took, shared, or utilized confidential information belonging exclusively to Plaintiffs.

US.108934916.01

87.     The Former Employees had been trained in the use and value of this information, as well as its ownership by Plaintiffs. CIG is also aware of Plaintiffs' ownership of the information at issue.

88.     Defendants' unauthorized use or disclosure of Plaintiffs' confidential information has severely damaged the competitive value of that information to Plaintiffs.

89.     Defendants' conduct constitutes criminal conversion under Ind. Code § 35-43-4-3.

90.     As a foreseeable, direct, and proximate result of Defendants' criminal conversion, Plaintiffs have suffered irreparable injury to their rights and pecuniary damages.

91.     As a result of this harm, Plaintiffs seek to recover actual and treble damages, as well as attorney's fees, under Ind. Code § 34-24-3-1 in an amount above $75,000 to be proven at trial.

## Count VI: Pecuniary Loss under Ind. Code § 34-24-3-1
### (Against Defendant Hanna)

92.     During his employment with USIC, Defendant Hanna knowingly and intentionally accessed a USIC-owned computer in order to unlawfully obtain Plaintiffs' confidential and trade secret information. He did so in part by copying trade-secret information to an external hard drive or USB flash drive.

93.     In order to hide the effects of his illegal misappropriation of Plaintiffs' information, Defendant Hanna used professional-grade software to wipe the computer's metadata, as a way of concealing which files Defendant Hanna accessed and copied before his departure.

US.108934916.01

94.     Indiana Code § 35-43-1-8 makes it a crime for any person to knowingly, intentionally, and without authorization "introduce[ ] a computer contaminant into a computer, computer system, or computer network." I.C. § 35-43-1-8(a)(4).

95.     Indiana Code § 35-31.5-2-52.7 defines "computer contaminant" as "a set of computer instructions designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." I.C. § 35-31.5-2-52.7(a); *see also* § 35-31.5-2-52.7(b)(2)(C).

96.     Defendant Hanna's introduction of software designed to modify or destroy metadata on his USIC-owned computer constitutes a computer crime under Indiana Code § 35-43-1-8.

97.     As a foreseeable, direct, and proximate result of Defendant Hanna's criminal computer offense, Plaintiffs have suffered irreparable injury to their rights and pecuniary damages.

98.     As a result of this harm, Plaintiffs seek to recover actual and treble damages, as well as attorney's fees, under Ind. Code § 34-24-3-1 in an amount to be proven at trial.

### Count VII: Preliminary and Permanent Injunction
### (Against All Defendants)

99.     Both preliminary and permanent injunctive relief are warranted on the facts of this case.

100.     For the reasons given above, Plaintiffs are likely to succeed on the merits of their claims and will present evidence substantiating their allegations in this Complaint.

101.     Furthermore, Plaintiffs will suffer irreparable harm if the Defendants are not enjoined from continuing to use or disclose Plaintiffs' confidential and trade-secret information.

US.108934916.01

Such information derives value from its secrecy, and its continued use by Defendants erodes the value of Plaintiffs' confidential and trade-secret information. Therefore, Plaintiffs have no adequate remedy at law.

102.    Public policy favors an injunction, because such an injunction will restrain Defendants only from unlawful activities.

### Prayer for Relief

Plaintiffs respectfully request the following relief:

1.    A judgment that Defendants are liable on all causes of action alleged in this Complaint;

2.    An order requiring Defendants to account for all gains, profits, and advantages derived from their misappropriation of Plaintiffs' confidential, proprietary, and/or trade-secret information;

3.    An order requiring Defendants to disgorge all profits earned from their unlawful conduct, together with restitution to Plaintiffs arising from Defendants' unlawful conduct;

4.    An order awarding actual damages according to proof;

5.    An order awarding exemplary or treble damages to the extent allowed by law and in an amount according to proof;

6.    An order awarding pre-judgment and post-judgment interest, as allowed by law;

7.    An order awarding attorney's fees, costs, and expenses;

8.    Preliminary and permanent injunctive relief pursuant to which Defendants, and their employees, supervisors, agents and affiliates, and all persons acting in concert or participating with them are ordered, enjoined, or restrained, directly or indirectly, by any means whatsoever, as follows:

17

(a) From disclosing or using anywhere Plaintiffs' confidential, proprietary, and/or trade-secret information or information derived therefrom;

(b) Immediately preserving and returning to Plaintiffs (i) all copies of all Plaintiffs' documents and proprietary or confidential information, including without limitation all Plaintiffs' financial statements, training materials, confidential client information, and private contact information for Plaintiffs' employees and locate technicians; (ii) all copies of all materials (in paper, electronic, or any other form) containing any, or derived from any, of Plaintiffs' trade secrets or other confidential or proprietary information;

(c) Turning over to the Court any proceeds that Defendants have received from their misappropriation of Plaintiffs' trade secrets and proprietary and confidential information and other unlawful conduct, such proceeds to be held in constructive trust until the conclusion of this litigation; and

(d) Further enjoining Defendants Daniels, Hanna, and Moody, for a period up to twelve months following their departure from USIC, from:

> (i) Knowingly, directly or indirectly, either attempting to or actually soliciting, diverting, accepting business from, or taking away a customer of USIC's that the Defendants did business with or supervised business-related activities with or about which the Defendants received Confidential Information in the two years preceding the termination of their employment with USIC;

> (ii) Knowingly soliciting or encouraging, directly or indirectly, in person or through others, any USIC employee to alter his or her employment

18

relationship with USIC to USIC's detriment, limited to USIC employees with whom the Defendants worked, over whom they had supervisory responsibilities, or about whom the Defendants gained knowledge by virtue of their employment with USIC in the two years preceding the termination of the Defendants' employment with USIC; and

(iii) Providing, supervising, or managing activities or services on behalf of CIG or any other competing business that is the same as or similar in function or purpose to the services Defendants provided to USIC during the two years preceding the end of their employment; and

9.   All such other relief as the Court deems just and proper.

## Jury Demand

Plaintiffs demand a trial by jury on all counts of their complaint.


Respectfully submitted,


_Paul A. Wolfla_

Paul A. Wolfla          IN Bar #24709-49
Mark L. Shope          IN Bar #30850-49
FAEGRE BAKER DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204
(317) 237-0300
(317) 237-1000 fax
Paul.Wolfla@FaegreBD.com
Mark.Shope@FaegreBD.com

ATTORNEYS FOR PLAINTIFFS

David B. Helms *(Motion for Temporary Admission Forthcoming)*
Benjamin D. Mooneyham *(Motion for Temporary Admission Forthcoming)*
GERMAN MAY PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
(816) 471-7700
(816) 471-2221 fax
DavidH@germanmay.com
BenM@germanmay.com

OF COUNSEL FOR PLAINTIFFS

19

# EXHIBIT A

## PROTECTIVE COVENANTS AGREEMENT[1]

Through this Protective Covenants Agreement ("Agreement"), USIC, LLC ("Company") and I, the undersigned (also referred to as "Employee"), agree that the following shall apply as a condition of my employment with the Company:

1.    <u>Special Relationship of Trust</u>.  I understand that I am being placed in a special position of trust and confidence.  Company agrees to provide me with one or more of the following as a result of this Agreement and my position with the Company: items of Confidential Information (defined below) related to my position; authorization to communicate and develop goodwill with Company customers; and/or, specialized training related to Company's business.  I agree to use these advantages of employment to further the business of the Company and not to knowingly cause harm to the business of the Company.

2.    <u>Duty of Loyalty</u>.  I will dedicate my full working time and efforts to the business of the Company and will not undertake or prepare to undertake any conflicting business activities while employed with the Company. The duties and obligations under this Agreement shall supplement and not replace or diminish the common law duties I would ordinary have to the Company as my employer.

3.    <u>Reasonable Restrictions</u>.   The Company's agreement to provide me with some of its Confidential Information, authorization to communicate with and develop goodwill with Company customers, and/or to receive specialized training related to Company's business, gives rise to an interest in reasonable restrictions that this Agreement is designed to enforce.  I agree that the restrictions in this Agreement are reasonable and necessary, and do not create an undue burden on me or the public.

4.    <u>Confidentiality Obligation</u>.  During my employment and for so long thereafter as the information is maintained as confidential by the Company, I will not engage in any use or disclosure of Confidential Information that is not authorized by the Company and undertaken for the benefit of the Company.  "**Confidential Information**" means information or a compilation of information, in any form (tangible or intangible), related to the Company's business that the Company has not made public or authorized for public disclosure and that is not generally known to the public through proper means. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by me or another person.  Confidential Information includes, but is not limited to: Company's business plans and analysis, customer and prospective customer lists, identities of customer contacts, customer preferences, marketing plans and strategies, research and development data, buying practices, internal business methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers and suppliers) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected

---

[1] Employees in Louisiana, Nebraska and Wisconsin are directed to Exhibit A for important limitations on the scope of the protective covenants within this Agreement.

PROTECTIVE COVENANTS AGREEMENT - PAGE 1

by this Agreement.  Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement.  I acknowledge that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of the Company, and thus, should be treated as Company's trade secrets.  The restrictions on use or disclosure of Confidential Information will only apply during employment and for two (2) years after the end of Employee's employment where information that does not qualify as a trade secret is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret.  Nothing herein shall be construed to reduce or diminish the applicability of trade secret protections, statutory or common law, that apply to the Company's trade secrets independent from this Agreement.  Furthermore, nothing herein shall be construed to require withholding information in violation of any applicable state or federal law, or to prohibit the reporting of information where such is protected by law. Furthermore, nothing herein shall be construed as limiting or impeding an employee covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information.  "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act.

5.    Preservation of Records.   I will preserve records of Company customers, prospects, suppliers, and other business relationships, and will not knowingly use these records to harm the Company's business interests.  Upon termination of employment, I will return all such records, and any copies (tangible and intangible) to the Company.  I understand that I am only authorized to access and use the Company's computers, email, or related computer systems to pursue matters that are consistent with the Company's business interests. I recognize that access or use of such systems to pursue personal business interests apart from the Company, to compete or to prepare to compete, or to otherwise knowingly undermine the Company's interests (such as, by way of example only, destroying its records or programs) is strictly prohibited and outside the scope of my authorized use of Company's systems.

6.    Notice and Garden Leave.   I will provide the Company with a minimum of thirty-days' advance, written notice of the termination of my employment before I begin working for or allow my name to be associated with any other person or entity other than the Company.  During this notice period, I will assist as requested in transitioning the business relationships with customers and other business contacts with which I have material involvement as needed to help the Company retain such business relationships.  I further understand that the Company can remove me from active service during this notice period at its discretion, but that doing so will not eliminate my duty to remain loyal to the Company while on the Company's payroll and to otherwise comply with the restrictions in this Agreement.    I understand that I may be held responsible for any damages, direct and consequential, caused by my failure to honor this notice and cooperation obligation.

7.    Customer Non-Interference Obligation.   For a period of twelve months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not knowingly, directly or indirectly, solicit, divert, accept business from, or take away,

PROTECTIVE COVENANTS AGREEMENT - PAGE 2

or attempt to solicit, divert, accept business from or take away, a customer of the Company that I did business with or supervised business related activities with or regarding which I received Confidential Information in the two year period preceding the termination of my employment (the "**Look Back Period**"), for the purpose of selling or providing a product or service that competes with or displaces a product or service of the Company that I had some material involvement in or received Confidential Information about while employed with the Company. This restriction is understood to be inherently reasonable in its geography because it is limited to the places where said customer(s) do business. I understand that the foregoing provision precludes me from working directly for a customer covered by the foregoing provision if my employment by such customer would result in the diversion, loss or reduction of the amount of work the Company does for such customer.

8.    <u>Employee Non-Interference Obligation</u>.  For a period of twelve months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not knowingly solicit or encourage, directly or indirectly, in person or through others, any employee of the Company with whom I worked, as to whom I had supervisory responsibilities, and/or about which I gained knowledge by virtue of my employment during the Look Back Period to terminate his/her relationship with the Company or to alter his/her relationship with the Company to the Company's detriment.   This restriction is not intended to prohibit general advertising of employment opportunities published to the general public that are not targeted at the Company's employees through newspaper or similar ads.  If I violate this paragraph, in addition to injunctive relief prohibiting further violations, I will pay the Company 25% of the previous 12-month's wages of any employee that the Company loses as a result of, in whole or in part, my violation which shall serve as liquidated damages to cover part of the damages resulting from the loss of the employee. This remedy is provided to address a portion of the harm caused by such a violation, but cannot fully address all of the harm caused by the loss of an employee due to a violation of this agreement due to the irreparable nature of the harm it causes.

9.    <u>Non-Compete Obligation</u>.      For a period of twelve months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not, as an employee, consultant, contractor, officer, owner, director, or otherwise, participate in, provide, supervise, or manage activities or services on behalf of a Competing Business that are the same as or similar in function or purpose to the services I provided the Company in the Look Back Period or that are otherwise likely or probable to result in the disclosure of Confidential Information. As used herein, "**Competing Business**" means any person or entity engaged in the business of providing underground utilities locating services, or the provision of related goods or services that would displace or compete with the goods and services of the Company. This restriction is limited to the "Territory" assigned to me in Exhibit B, as it may be amended from time to time. This paragraph is not intended to prohibit: (i) employment with an independently operated subsidiary, division, or unit of a diversified corporation so long as the independently operated business unit at issue is truly independent and does not compete in any way with the Company; or, (ii) a passive and non-controlling ownership of less than 2% of the stock in a publicly traded company.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 3**

10.   <u>Intellectual Property Assignment.</u>[2]  All CIIP shall be the Company's exclusive property unless otherwise agreed by both parties in writing.  While employed, and as necessary thereafter, you will assist Company to obtain patents or copyrights on all such CIIP that Company seeks to protect, and will execute all documents and do everything necessary to obtain for Company copyrights, patents, licenses, and other rights and interests that would be necessary to secure for the Company the complete benefit of CIIP.  You hereby assign to Company or its designee all right, title, and interest to all CIIP that you have acquired or do acquire in the future, during employment or association with the Company or its Related Entities.  **"Company Inventions and Intellectual Property ("CIIP")"** means all intellectual property: (a) that relates to Company's business, or to any actual or demonstrably anticipated Company research, future work, or projects, whether conceived or developed alone or with others, and whether conceived or developed during regular work hours; or (b) that results from your work performed for Company or performed on Company time or using Company resources.

11.   <u>Severance.</u>  In the event Employee's employment is terminated without Cause, Company shall pay Employee severance equal to Employee's base salary, less applicable withholding and taxes, for a period of twelve months ("Severance Period").  If, in the Company's exercise of reasonable discretion, you violate any of the provisions contained in Sections 4, 7, 8, and 9 during the Severance Period, Company shall be relieved of any obligation to make further severance payments.  For purposes of this provision, **"Cause"** shall mean conduct, which in the Company's reasonable exercise of discretion, constitutes: violation of this Protective Covenants Agreement; material violation of the Company's policies and procedures (including those policies and procedures set forth in Employee Handbook, which includes, without limitation, commission of those offenses identified as "serious offenses" in Section 2.7(a)(1)-(21) of the disciplinary policy); engaging in workplace violence; disregarding the Company's policies regarding safety in the workplace; gross insubordination; job abandonment; failure to perform your job duties to the Company's reasonable satisfaction; engaging in conduct that casts the Company in a bad light; failing to safeguard Company resources; falsification of Company records and/or other acts of dishonesty or fraud against the company; and stealing from the Company.  A de minimus violation of the Company's policies and procedures will not constitute "Cause" unless it is: (a) a repeated commission of a minor infraction which continues despite counseling to cease the offending conduct; and/or (b) results in the endangerment of the Company's assets or employees.  An offense identified as a "serious offense" under Section 2.7(a)(1)-(21) shall never be considered a "de minimus" violation.

12.   <u>General Terms.</u>  (a) I understand that my post-employment obligations under this Agreement will survive the termination of this Agreement and/or termination of my employment, regardless of the cause of the termination, unless otherwise explicitly agreed in a writing signed by all parties.  (b) In the event I violate one of the time-limited restrictions in this Agreement, then the restricted period for such violated restriction shall be extended by one day for each day I have violated the restriction up to a maximum extension equal to the length of the period of forbearance originally bargained for.  (c) The existence of a cause of action by me against Company shall not constitute a defense to enforcement of the restrictions on me contained in this Agreement. (d) If a court finds a restriction herein to be unenforceable as written, the Court will revise the restriction

---

[2] Employees in Illinois, Kansas, Minnesota, North Carolina, and Washington are directed to Exhibit C for important limitations on the scope of this Intellectual Property Assignment Provision.

PROTECTIVE COVENANTS AGREEMENT - PAGE 4

(for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's legitimate business interests. (e) A violation of this Agreement would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company, for which there would not be an adequate remedy at law. Accordingly, if I breach or threaten to breach this Agreement, the Company shall be entitled to temporary and permanent injunctive relief in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled. (f) This Agreement will inure to the benefit of Company's successors and assigns, and may be enforced by any one or more of same, without need of any further agreement from me. (g) As used herein, references to restrictions used to protect the property and interests of the Company will be understood to include protection of the property and interests of any subsidiary, affiliate, or parent of the Company with which I have any material involvement during my employment with the Company. (h) I understand that the Company may elect to provide another party notice of this Agreement and an opinion about its applicability. While I reserve the right to also communicate my disagreement with such an opinion if I disagree, I recognize the Company's legitimate business interest in expressing its opinion and consent to it doing so if it believes such is necessary. I will not assert any claim that such conduct is legally actionable interference or otherwise impermissible regardless of whether or not this Agreement is later found to be enforceable in whole or in part.

13.     The laws of the State of Indiana will control the interpretation and application of this Agreement, without regard to any conflicts of law principles of Indiana or any other state to the contrary. I consent to the personal jurisdiction of courts in Marion County, over me and waive all rights to the contrary; and, the exclusive venue and forum for any legal action in a court of law arising from this Agreement shall be a court of competent jurisdiction located in Marion County, Indiana.

14.     In order to help avoid disputes and related litigation costs, during employment and for a period of twelve months thereafter, I will give the Company thirty (30) days advance written notice prior to accepting any position with a Competing Business and will engage in an interactive dialogue and exchange of information about the position I am considering accepting if requested to do so. I understand that the purpose of this notice obligation is to help avoid the cost of litigation that might otherwise be necessary to pursue discovery, and to explore negotiated restrictions that would protect the Company's legitimate business interests. Accordingly, if I fail to provide such notice I may be held responsible for costs of litigation and other consequential damages. I acknowledge that my obligations under this paragraph are in addition to the notice requirements under Paragraph 6.

I acknowledge that my employment with the Company is at will, and this Agreement does not constitute a contract for employment. This Agreement shall be considered made on the date signed by me below which shall be the effective date of this Agreement unless entering into this Agreement was or is a condition of my initial employment in which case the terms of this Agreement are understood to be operative upon the inception of my employment (whether reduced to writing on that specific date or not).

**PROTECTIVE COVENANTS AGREEMENT - PAGE 5**

**EMPLOYEE:**                    USIC, LLC

_____
(signature)

Printed Name: _Travis Daniels_    By: _____

Date: _____10-3-13_____    Its: _____11-8-2013_____

PROTECTIVE COVENANTS AGREEMENT – PAGE 6

## EXHIBIT A

**Louisiana:**

For a Louisiana resident, for so long as Employee resides in Louisiana and is subject to the laws of Louisiana, this Protective Covenants Agreement is modified as follows:

The enforcement of the restrictions in Sections 7 & 9 will be limited within the state of Louisiana to the Parishes in which Employee assisted Company in providing its products and services, as are indicated by circling below; provided, however, that nothing in Agreement may be construed to prohibit the enforcement of Sections 7 & 9 in accordance with their terms in states outside of Louisiana.

| | | | |
|---|---|---|---|
| Acadia | Allen | Ascension | Assumption |
| Avoyelles | Beauregard | Bienville | Bossier |
| Caddo | Calcasieu | Caldwell | Cameron |
| Catahoula | Claiborne | Concordia | De Soto |
| East Baton Rouge | East Carroll | East Feliciana | Evangeline |
| Franklin | Grant | Iberia | Iberville |
| Jackson | Jefferson | Jefferson Davis | Lafayette |
| Lafourche | La Salle | Lincoln | Livingston |
| Madison | Morehouse | Natchitoches | Orleans |
| Ouachita | Plaquemines | Pointe Coupee | Rapides |
| Red River | Richland | Sabine | St. Bernard |
| St. Charles | St. Helena | St. James | |
| St. John the Baptist | St. Landry | St. Martin | St. Mary |
| St. Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

**Nebraska:**

For a Nebraska resident, for so long as Employee resides in Nebraska and is subject to the laws of Nebraska, this Protective Covenants Agreement is modified as follows:

Section 7 is limited to Company customers with which you had business dealings in the Look Back Period and excludes any entity who ceased being a customer at least six (6) months prior to your termination (due to no fault of you).

**Wisconsin:**

For a Wisconsin resident, for so long as Employee resides in Wisconsin and is subject to the laws of Wisconsin, this Protective Covenants Agreement is modified as follows:

(a) the tolling language in Section 12(b) shall not apply.

PROTECTIVE COVENANTS AGREEMENT - PAGE 7

## EXHIBIT B

1.     **Territory**

The "Territory" described below is the geographic area assigned to the Employee for purposes of the restrictions contained in Employee's Protective Covenants Agreement that refer to a Territory at the time this agreement is entered into.   This Territory will be considered modified by mutual agreement of the parties if Employee is provided notice of a new or modified territory subsequently assigned to him or her, and Employee decides to remain in the employ of the Company for 15 days or more after such notice.  For a period of one year following such a modification, the restrictions applicable to the old territory will remain in place for that old territory in addition to the restrictions that will attach to the newly assigned or modified Territory.

I understand that my assigned Territory is:

The state Iowa, including but not limited to the cities, counties, municipalities, territory and/or geographic area serviced by the Company's Iowa district offices located in Cedar Rapids, Bettendorf, and Urbandale, IA, and any other territory which I am assigned to oversee during the Look Back Period.

EMPLOYEE:

(signature)

Printed Name: _Travis Daniels_

Date: _10-3-13_

**PROTECTIVE COVENANTS AGREEMENT - PAGE 8**

**EXHIBIT C**

**Notice Regarding Invention Assignment**

1.      For an employee residing in Illinois, Kansas, or North Carolina, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.   Delaware Code Title 19 Section 805; Illinois 765ILCS1060/1-3, "Employees Patent Act"; Kansas Statutes Section 44-130; North Carolina General Statutes Article 10A, Chapter 66, Commerce and Business, Section 66-57.1.

2.      For an employee residing in Washington, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.  Washington Rev. Code, Title 49 RCW: Labor Regulations Chapter 49.44.140.

3.      For an employee residing in Minnesota, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, and (a) which does not relate (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by Employee     for     the     Company.        Minnesota     Statutes     13A     Section     181.78.

# EXHIBIT B

# PROTECTIVE COVENANTS AGREEMENT[1]

Through this Protective Covenants Agreement ("Agreement"), United States Infrastructure Corporation ("Company") and I, the undersigned (also referred to as "Employee"), agree that the following shall apply as a condition of my employment with the Company:

1.      Special Relationship of Trust.  I understand that I am being placed in a special position of trust and confidence. Company agrees to provide me with one or more of the following as a result of this Agreement and my position with the Company: items of Confidential Information (defined below) related to my position; authorization to communicate and develop goodwill with Company customers; and/or, specialized training related to Company's business.  I agree to use these advantages of employment to further the business of the Company and not to knowingly cause harm to the business of the Company.

2.      Duty of Loyalty.  I will dedicate my full working time and efforts to the business of the Company and will not undertake or prepare to undertake any conflicting business activities while employed with the Company. The duties and obligations under this Agreement shall supplement and not replace or diminish the common law duties I would ordinary have to the Company as my employer.

3.      Reasonable Restrictions.  The Company's agreement to provide me with some of its Confidential Information, authorization to communicate with and develop goodwill with Company customers, and/or to receive specialized training related to Company's business, gives rise to an interest in reasonable restrictions that this Agreement is designed to enforce.  I agree that the restrictions in this Agreement are reasonable and necessary, and do not create an undue burden on me or the public.

4.      Confidentiality Obligation.  During my employment and for so long thereafter as the information is maintained as confidential by the Company, I will not engage in any use or disclosure of Confidential Information that is not authorized by the Company and undertaken for the benefit of the Company.  **"Confidential Information"** means information or a compilation of information, in any form (tangible or intangible), related to the Company's business that the Company has not made public or authorized for public disclosure and that is not generally known to the public through proper means. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by me or another person.  Confidential Information includes, but is not limited to: Company's business plans and analysis, customer and prospective customer lists, identities of customer contacts, customer preferences, marketing plans and strategies, research and development data, buying practices, internal business methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers and suppliers) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected

---

[1] Employees in Louisiana, Nebraska and Wisconsin are directed to Exhibit A for important limitations on the scope of the protective covenants within this Agreement.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 1**

by this Agreement. Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement. I acknowledge that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of the Company, and thus, should be treated as Company's trade secrets. The restrictions on use or disclosure of Confidential Information will only apply during employment and for two (2) years after the end of Employee's employment where information that does not qualify as a trade secret is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret. Nothing herein shall be construed to reduce or diminish the applicability of trade secret protections, statutory or common law, that apply to the Company's trade secrets independent from this Agreement. Furthermore, nothing herein shall be construed to require withholding information in violation of any applicable state or federal law, or to prohibit the reporting of information where such is protected by law. Furthermore, nothing herein shall be construed as limiting or impeding an employee covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act.

5.     Preservation of Records. I will preserve records of Company customers, prospects, suppliers, and other business relationships, and will not knowingly use these records to harm the Company's business interests. Upon termination of employment, I will return all such records, and any copies (tangible and intangible) to the Company. I understand that I am only authorized to access and use the Company's computers, email, or related computer systems to pursue matters that are consistent with the Company's business interests. I recognize that access or use of such systems to pursue personal business interests apart from the Company, to compete or to prepare to compete, or to otherwise knowingly undermine the Company's interests (such as, by way of example only, destroying its records or programs) is strictly prohibited and outside the scope of my authorized use of Company's systems.

6.     Notice and Garden Leave. I will provide the Company with a minimum of thirty-days' advance, written notice of the termination of my employment before I begin working for or allow my name to be associated with any other person or entity other than the Company. During this notice period, I will assist as requested in transitioning the business relationships with customers and other business contacts with which I have material involvement as needed to help the Company retain such business relationships. I further understand that the Company can remove me from active service during this notice period at its discretion, but that doing so will not eliminate my duty to remain loyal to the Company while on the Company's payroll and to otherwise comply with the restrictions in this Agreement. I understand that I may be held responsible for any damages, direct and consequential, caused by my failure to honor this notice and cooperation obligation.

7.     Customer Non-Interference Obligation. For a period of twelve months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not knowingly, directly or indirectly, solicit, divert, accept business from, or take away,

**PROTECTIVE COVENANTS AGREEMENT - PAGE 2**

or attempt to solicit, divert, accept business from or take away, a customer of the Company that I did business with or supervised business related activities with or regarding which I received Confidential Information in the two year period preceding the termination of my employment (the "**Look Back Period**"), for the purpose of selling or providing a product or service that competes with or displaces a product or service of the Company that I had some material involvement in or received Confidential Information about while employed with the Company. This restriction is understood to be inherently reasonable in its geography because it is limited to the places where said customer(s) do business. I understand that the foregoing provision precludes me from working directly for a customer covered by the foregoing provision if my employment by such customer would result in the diversion, loss or reduction of the amount of work the Company does for such customer.

8. <u>Employee Non-Interference Obligation</u>. For a period of twelve months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not knowingly solicit or encourage, directly or indirectly, in person or through others, any employee of the Company with whom I worked, as to whom I had supervisory responsibilities, and/or about which I gained knowledge by virtue of my employment during the Look Back Period to terminate his/her relationship with the Company or to alter his/her relationship with the Company to the Company's detriment. This restriction is not intended to prohibit general advertising of employment opportunities published to the general public that are not targeted at the Company's employees through newspaper or similar ads. If I violate this paragraph, in addition to injunctive relief prohibiting further violations, I will pay the Company 25% of the previous 12-month's wages of any employee that the Company loses as a result of, in whole or in part, my violation which shall serve as liquidated damages to cover part of the damages resulting from the loss of the employee. This remedy is provided to address a portion of the harm caused by such a violation, but cannot fully address all of the harm caused by the loss of an employee due to a violation of this agreement due to the irreparable nature of the harm it causes.

9. <u>Non-Compete Obligation</u>. For a period of twelve months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not, as an employee, consultant, contractor, officer, owner, director, or otherwise, participate in, provide, supervise, or manage activities or services on behalf of a Competing Business that are the same as or similar in function or purpose to the services I provided the Company in the Look Back Period or that are otherwise likely or probable to result in the disclosure of Confidential Information. As used herein, "**Competing Business**" means any person or entity engaged in the business of providing underground utilities locating services, or the provision of related goods or services that would displace or compete with the goods and services of the Company. This restriction is limited to the "Territory" assigned to me in Exhibit B, as it may be amended from time to time. This paragraph is not intended to prohibit: (i) employment with an independently operated subsidiary, division, or unit of a diversified corporation so long as the independently operated business unit at issue is truly independent and does not compete in any way with the Company; or, (ii) a passive and non-controlling ownership of less than 2% of the stock in a publicly traded company.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 3**

10.    Intellectual Property Assignment.[2]  All CIIP shall be the Company's exclusive property unless otherwise agreed by both parties in writing.  While employed, and as necessary thereafter, you will assist Company to obtain patents or copyrights on all such CIIP that Company seeks to protect, and will execute all documents and do everything necessary to obtain for Company copyrights, patents, licenses, and other rights and interests that would be necessary to secure for the Company the complete benefit of CIIP.  You hereby assign to Company or its designee all right, title, and interest to all CIIP that you have acquired or do acquire in the future, during employment or association with the Company or its Related Entities.  **Company Inventions and Intellectual Property ("CIIP")"** means all intellectual property: (a) that relates to Company's business, or to any actual or demonstrably anticipated Company research, future work, or projects, whether conceived or developed alone or with others, and whether conceived or developed during regular work hours; or (b) that results from your work performed for Company or performed on Company time or using Company resources.

11.    Severance.  In the event Employee's employment is terminated without Cause, Company shall pay Employee severance equal to Employee's base salary, less applicable withholding and taxes, for a period of twelve months ("Severance Period").  If, in the Company's exercise of reasonable discretion, you violate any of the provisions contained in Sections 4, 7, 8, and 9 during the Severance Period, Company shall be relieved of any obligation to make further severance payments.  For purposes of this provision, **"Cause"** shall mean conduct, which in the Company's reasonable exercise of discretion, constitutes: violation of this Protective Covenants Agreement; material violation of the Company's policies and procedures (including those policies and procedures set forth in Employee Handbook, which includes, without limitation, commission of those offenses identified as "serious offenses" in Section 2.7(a)(1)-(21) of the disciplinary policy); engaging in workplace violence; disregarding the Company's policies regarding safety in the workplace; gross insubordination; job abandonment; failure to perform your job duties to the Company's reasonable satisfaction; engaging in conduct that casts the Company in a bad light; failing to safeguard Company resources; falsification of Company records and/or other acts of dishonesty or fraud against the company; and stealing from the Company.  A de minimus violation of the Company's policies and procedures will not constitute "Cause" unless it is: (a) a repeated commission of a minor infraction which continues despite counseling to cease the offending conduct; and/or (b) results in the endangerment of the Company's assets or employees.  An offense identified as a "serious offense" under Section 2.7(a)(1)-(21) shall never be considered a "de minimus" violation.

12.    General Terms.  (a) I understand that my post-employment obligations under this Agreement will survive the termination of this Agreement and/or termination of my employment, regardless of the cause of the termination, unless otherwise explicitly agreed in a writing signed by all parties. (b) In the event I violate one of the time-limited restrictions in this Agreement, then the restricted period for such violated restriction shall be extended by one day for each day I have violated the restriction up to a maximum extension equal to the length of the period of forbearance originally bargained for.  (c) The existence of a cause of action by me against Company shall not constitute a defense to enforcement of the restrictions on me contained in this Agreement. (d) If a court finds a restriction herein to be unenforceable as written, the Court will revise the restriction

---

[2] Employees in Illinois, Kansas, Minnesota, North Carolina, and Washington are directed to Exhibit C for important limitations on the scope of this Intellectual Property Assignment Provision.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 4**

(for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's legitimate business interests. (e) A violation of this Agreement would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company, for which there would not be an adequate remedy at law. Accordingly, if I breach or threaten to breach this Agreement, the Company shall be entitled to temporary and permanent injunctive relief in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled. (f) This Agreement will inure to the benefit of Company's successors and assigns, and may be enforced by any one or more of same, without need of any further agreement from me. (g) As used herein, references to restrictions used to protect the property and interests of the Company will be understood to include protection of the property and interests of any subsidiary, affiliate, or parent of the Company with which I have any material involvement during my employment with the Company. (h) I understand that the Company may elect to provide another party notice of this Agreement and an opinion about its applicability. While I reserve the right to also communicate my disagreement with such an opinion if I disagree, I recognize the Company's legitimate business interest in expressing its opinion and consent to it doing so if it believes such is necessary. I will not assert any claim that such conduct is legally actionable interference or otherwise impermissible regardless of whether or not this Agreement is later found to be enforceable in whole or in part.

13.     The laws of the State of Indiana will control the interpretation and application of this Agreement, without regard to any conflicts of law principles of Indiana or any other state to the contrary. I consent to the personal jurisdiction of courts in Marion County, over me and waive all rights to the contrary; and, the exclusive venue and forum for any legal action in a court of law arising from this Agreement shall be a court of competent jurisdiction located in Marion County, Indiana.

14.     In order to help avoid disputes and related litigation costs, during employment and for a period of twelve months thereafter, I will give the Company thirty (30) days advance written notice prior to accepting any position with a Competing Business and will engage in an interactive dialogue and exchange of information about the position I am considering accepting if requested to do so. I understand that the purpose of this notice obligation is to help avoid the cost of litigation that might otherwise be necessary to pursue discovery, and to explore negotiated restrictions that would protect the Company's legitimate business interests. Accordingly, if I fail to provide such notice I may be held responsible for costs of litigation and other consequential damages. I acknowledge that my obligations under this paragraph are in addition to the notice requirements under Paragraph 6.

I acknowledge that my employment with the Company is at will, and this Agreement does not constitute a contract for employment. This Agreement shall be considered made on the date signed by me below which shall be the effective date of this Agreement unless entering into this Agreement was or is a condition of my initial employment in which case the terms of this Agreement are understood to be operative upon the inception of my employment (whether reduced to writing on that specific date or not).

PROTECTIVE COVENANTS AGREEMENT - PAGE 5

**EMPLOYEE:**

_(signature)_

Printed Name: BRIAN HANNA

Date: 5/21/12

**UNITED STATES
INFRASTRUCTURE CORPORATION**

By: _____

Its: COO

PROTECTIVE COVENANTS AGREEMENT - PAGE 6

## EXHIBIT A

**Louisiana:**

For a Louisiana resident, for so long as Employee resides in Louisiana and is subject to the laws of Louisiana, this Protective Covenants Agreement is modified as follows:

> The enforcement of the restrictions in Sections 7 & 9 will be limited within the state of Louisiana to the Parishes in which Employee assisted Company in providing its products and services, as are indicated by circling below; provided, however, that nothing in Agreement may be construed to prohibit the enforcement of Sections 7 & 9 in accordance with their terms in states outside of Louisiana.

| | | | |
|---|---|---|---|
| Acadia | Allen | Ascension | Assumption |
| Avoyelles | Beauregard | Bienville | Bossier |
| Caddo | Calcasieu | Caldwell | Cameron |
| Catahoula | Claiborne | Concordia | De Soto |
| East Baton Rouge | East Carroll | East Feliciana | Evangeline |
| Franklin | Grant | Iberia | Iberville |
| Jackson | Jefferson | Jefferson Davis | Lafayette |
| Lafourche | La Salle | Lincoln | Livingston |
| Madison | Morehouse | Natchitoches | Orleans |
| Ouachita | Plaquemines | Pointe Coupee | Rapides |
| Red River | Richland | Sabine | St. Bernard |
| St. Charles | St. Helena | St. James | |
| St. John the Baptist | St. Landry | St. Martin | St. Mary |
| St. Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

**Nebraska:**

For a Nebraska resident, for so long as Employee resides in Nebraska and is subject to the laws of Nebraska, this Protective Covenants Agreement is modified as follows:

> Section 7 is limited to Company customers with which you had business dealings in the Look Back Period and excludes any entity who ceased being a customer at least six (6) months prior to your termination (due to no fault of you).

**Wisconsin:**

For a Wisconsin resident, for so long as Employee resides in Wisconsin and is subject to the laws of Wisconsin, this Protective Covenants Agreement is modified as follows:

> (a) the tolling language in Section 12(b) shall not apply.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 7**

## EXHIBIT B

1.    **Territory**

The "Territory" described below is the geographic area assigned to the Employee for purposes of the restrictions contained in Employee's Protective Covenants Agreement that refer to a Territory at the time this agreement is entered into. This Territory will be considered modified by mutual agreement of the parties if Employee is provided notice of a new or modified territory subsequently assigned to him or her, and Employee decides to remain in the employ of the Company for 15 days or more after such notice. For a period of one year following such a modification, the restrictions applicable to the old territory will remain in place for that old territory in addition to the restrictions that will attach to the newly assigned or modified Territory.

I understand that my assigned Territory is:

The states of South Dakota, Iowa, Kansas, Nebraska, Colorado, Wyoming, Washington and the province of Alberta, Canada, including but not limited to the cities, counties, municipalities, territory and/or geographic area serviced by the Company's South Dakota district office located in Sioux Falls, SD, the Iowa district offices located in Cedar Rapids, IA, Bettendorf, IA, and Urbandale, IA, the Kansas district office located in Wichita, KS, the Nebraska district office located in Omaha, NE, the Colorado district offices located in Colorado Springs, CO and Grand Junction, CO, the Wyoming district office located in Cheyenne, WY, the Washington district office located in Woodinville, WA, and/or the Alberta, Canada district office located in Calgary, Alberta, Canada and any other territory which I am assigned to oversee during the Look Back Period.

EMPLOYEE:

_____
(signature)

Printed Name: _BRIAN HANNA_

Date: _5/21/99_

**PROTECTIVE COVENANTS AGREEMENT - PAGE 8**

**EXHIBIT C**

**Notice Regarding Invention Assignment**

1.      For an employee residing in Illinois, Kansas, or North Carolina, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.   Delaware Code Title 19 Section 805; Illinois 765ILCS1060/1-3, "Employees Patent Act"; Kansas Statutes Section 44-130; North Carolina General Statutes Article 10A, Chapter 66, Commerce and Business, Section 66-57.1.

2.      For an employee residing in Washington, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.   Washington Rev. Code, Title 49 RCW: Labor Regulations Chapter 49.44.140.

3.      For an employee residing in Minnesota, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, and (a) which does not relate (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by Employee    for    the    Company.     Minnesota    Statutes    13A    Section    181.78.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 9**

# EXHIBIT C

## PROTECTIVE COVENANTS AGREEMENT[1]

Through this Protective Covenants Agreement ("Agreement"), United States Infrastructure Corporation ("Company") and I, the undersigned (also referred to as "Employee"), agree that the following shall apply as a condition of my employment with the Company:

1.     Special Relationship of Trust.  I understand that I am being placed in a special position of trust and confidence.  Company agrees to provide me with one or more of the following as a result of this Agreement and my position with the Company: items of Confidential Information (defined below) related to my position; authorization to communicate and develop goodwill with Company customers; and/or, specialized training related to Company's business.  I agree to use these advantages of employment to further the business of the Company and not to knowingly cause harm to the business of the Company.

2.     Duty of Loyalty.  I will dedicate my full working time and efforts to the business of the Company and will not undertake or prepare to undertake any conflicting business activities while employed with the Company. The duties and obligations under this Agreement shall supplement and not replace or diminish the common law duties I would ordinary have to the Company as my employer.

3.     Reasonable Restrictions.  The Company's agreement to provide me with some of its Confidential Information, authorization to communicate with and develop goodwill with Company customers, and/or to receive specialized training related to Company's business, gives rise to an interest in reasonable restrictions that this Agreement is designed to enforce.  I agree that the restrictions in this Agreement are reasonable and necessary, and do not create an undue burden on me or the public.

4.     Confidentiality Obligation.  During my employment and for so long thereafter as the information is maintained as confidential by the Company, I will not engage in any use or disclosure of Confidential Information that is not authorized by the Company and undertaken for the benefit of the Company.  "**Confidential Information**" means information or a compilation of information, in any form (tangible or intangible), related to the Company's business that the Company has not made public or authorized for public disclosure and that is not generally known to the public through proper means. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by me or another person.  Confidential Information includes, but is not limited to: Company's business plans and analysis, customer and prospective customer lists, identities of customer contacts, customer preferences, marketing plans and strategies, research and development data, buying practices, internal business methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers and suppliers) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected.

---

[1] Employees in Louisiana, Nebraska and Wisconsin are directed to Exhibit A for important limitations on the scope of the protective covenants within this Agreement.

PROTECTIVE COVENANTS AGREEMENT - PAGE 1

by this Agreement. Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement. I acknowledge that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of the Company, and thus, should be treated as Company's trade secrets. The restrictions on use or disclosure of Confidential Information will only apply during employment and for two (2) years after the end of Employee's employment where information that does not qualify as a trade secret is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret. Nothing herein shall be construed to reduce or diminish the applicability of trade secret protections, statutory or common law, that apply to the Company's trade secrets independent from this Agreement. Furthermore, nothing herein shall be construed to require withholding information in violation of any applicable state or federal law, or to prohibit the reporting of information where such is protected by law. Furthermore, nothing herein shall be construed as limiting or impeding an employee covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act.

5.  Preservation of Records. I will preserve records of Company customers, prospects, suppliers, and other business relationships, and will not knowingly use these records to harm the Company's business interests. Upon termination of employment, I will return all such records, and any copies (tangible and intangible) to the Company. I understand that I am only authorized to access and use the Company's computers, email, or related computer systems to pursue matters that are consistent with the Company's business interests. I recognize that access or use of such systems to pursue personal business interests apart from the Company, to compete or to prepare to compete, or to otherwise knowingly undermine the Company's interests (such as, by way of example only, destroying its records or programs) is strictly prohibited and outside the scope of my authorized use of Company's systems.

6.  Notice and Garden Leave. I will provide the Company with a minimum of thirty-days' advance, written notice of the termination of my employment before I begin working for or allow my name to be associated with any other person or entity other than the Company. During this notice period, I will assist as requested in transitioning the business relationships with customers and other business contacts with which I have material involvement as needed to help the Company retain such business relationships. I further understand that the Company can remove me from active service during this notice period at its discretion, but that doing so will not eliminate my duty to remain loyal to the Company while on the Company's payroll and to otherwise comply with the restrictions in this Agreement.   I understand that I may be held responsible for any damages, direct and consequential, caused by my failure to honor this notice and cooperation obligation.

7.  Customer Non-Interference Obligation. For a period of six months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not knowingly, directly or indirectly, solicit, divert, accept business from, or take away,

**PROTECTIVE COVENANTS AGREEMENT - PAGE 2**

or attempt to solicit, divert, accept business from or take away, a customer of the Company that I did business with or supervised business related activities with or regarding which I received Confidential Information in the two year period preceding the termination of my employment (the "**Look Back Period**"), for the purpose of selling or providing a product or service that competes with or displaces a product or service of the Company that I had some material involvement in or received Confidential Information about while employed with the Company. This restriction is understood to be inherently reasonable in its geography because it is limited to the places where said customer(s) do business. This remedy is provided to address a portion of the harm caused by such a violation, but cannot fully address all of the harm caused by the loss of an employee due to a violation of this agreement due to the irreparable nature of the harm it causes. I understand that the foregoing provision precludes me from working directly for a customer covered by the foregoing provision if my employment by such customer would result in the diversion, loss or reduction of the amount of work the Company does for such customer.

8.    <u>Employee Non-Interference Obligation.</u>    For a period of six months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not knowingly solicit or encourage, directly or indirectly, in person or through others, any employee of the Company with whom I worked, as to whom I had supervisory responsibilities, and/or about which I gained knowledge by virtue of my employment during the Look Back Period to terminate his/her relationship with the Company or to alter his/her relationship with the Company to the Company's detriment. This restriction is not intended to prohibit general advertising of employment opportunities published to the general public that are not targeted at the Company's employees through newspaper or similar ads. If I violate this paragraph, in addition to injunctive relief prohibiting further violations, I will pay the Company 25% of the previous 12-month's wages of any employee that the Company loses as a result of, in whole or in part, my violation which shall serve as liquidated damages to cover part of the damages resulting from the loss of the employee. This remedy is provided to address a portion of the harm caused by such a violation, but cannot fully address all of the harm caused by the loss of an employee due to a violation of this agreement due to the irreparable nature of the harm it causes.

9.    <u>Non-Compete Obligation.</u>    For a period of six months following the termination of my employment with Company, regardless of who initiates such termination or why, I will not, as an employee, consultant, contractor, officer, owner, director, or otherwise, participate in, provide, supervise, or manage activities or services on behalf of a Competing Business that are the same as or similar in function or purpose to the services I provided the Company in the Look Back Period or that are otherwise likely or probable to result in the disclosure of Confidential Information. As used herein, "**Competing Business**" means any person or entity engaged in the business of providing underground utilities locating services, or the provision of related goods or services that would displace or compete with the goods and services of the Company. This restriction is limited to the United States and the province of Alberta, Canada, and any other Canadian province in which the Company is providing service at the time of enforcement. This paragraph is not intended to prohibit: (i) employment with an independently operated subsidiary, division, or unit of a diversified corporation so long as the independently operated business unit at issue is truly independent and does not compete in any way with the Company; or, (ii) a passive and non-controlling ownership of less than 2% of the stock in a publicly traded company.

PROTECTIVE COVENANTS AGREEMENT - PAGE 3

10.     Intellectual Property Assignment.[2]  All CIIP shall be the Company's exclusive property unless otherwise agreed by both parties in writing.  While employed, and as necessary thereafter, you will assist Company to obtain patents or copyrights on all such CIIP that Company seeks to protect, and will execute all documents and do everything necessary to obtain for Company copyrights, patents, licenses, and other rights and interests that would be necessary to secure for the Company the complete benefit of CIIP.  You hereby assign to Company or its designee all right, title, and interest to all CIIP that you have acquired or do acquire in the future, during employment or association with the Company or its Related Entities.  **"Company Inventions and Intellectual Property ("CIIP")"** means all intellectual property: (a) that relates to Company's business, or to any actual or demonstrably anticipated Company research, future work, or projects, whether conceived or developed alone or with others, and whether conceived or developed during regular work hours; or (b) that results from your work performed for Company or performed on Company time or using Company resources.

11.     Severance.  In the event Employee's employment is terminated without Cause, Company shall pay Employee severance equal to Employee's base salary, less applicable withholding and taxes, for a period of six months ("Severance Period").  If, in the Company's exercise of reasonable discretion, you violate any of the provisions contained in Sections 4, 7, 8, and 9 during the Severance Period, Company shall be relieved of any obligation to make further severance payments.  For purposes of this provision, **"Cause"** shall mean conduct, which in the Company's reasonable exercise of discretion, constitutes: violation of this Protective Covenants Agreement; material violation of the Company's policies and procedures (including those policies and procedures set forth in Employee Handbook, which includes, without limitation, commission of those offenses identified as "serious offenses" in Section 2.7(a)(1)-(21) of the disciplinary policy); engaging in workplace violence; disregarding the Company's policies regarding safety in the workplace; gross insubordination; job abandonment; failure to perform your job duties to the Company's reasonable satisfaction; engaging in conduct that casts the Company in a bad light; failing to safeguard Company resources; falsification of Company records and/or other acts of dishonesty or fraud against the company; and stealing from the Company.  A de minimus violation of the Company's policies and procedures will not constitute "Cause" unless it is: (a) a repeated commission of a minor infraction which continues despite counseling to cease the offending conduct; and/or (b) results in the endangerment of the Company's assets or employees.  An offense identified as a "serious offense" under Section 2.7(a)(1)-(21) shall never be considered a "de minimus" violation.

12.     General Terms.  (a) I understand that my post-employment obligations under this Agreement will survive the termination of this Agreement and/or termination of my employment, regardless of the cause of the termination, unless otherwise explicitly agreed in a writing signed by all parties.  (b) In the event I violate one of the time-limited restrictions in this Agreement, then the restricted period for such violated restriction shall be extended by one day for each day I have violated the restriction up to a maximum extension equal to the length of the period of forbearance originally bargained for.  (c) The existence of a cause of action by me against Company shall not constitute a defense to enforcement of the restrictions on me contained in this Agreement.  (d) If a court finds a restriction herein to be unenforceable as written, the Court will revise the restriction

---

[2] Employees in Illinois, Kansas, Minnesota, North Carolina, and Washington are directed to Exhibit B for important limitations on the scope of this Intellectual Property Assignment Provision.

(for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's legitimate business interests. (e) A violation of this Agreement would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company, for which there would not be an adequate remedy at law. Accordingly, if I breach or threaten to breach this Agreement, the Company shall be entitled to temporary and permanent injunctive relief in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled. (f) This Agreement will inure to the benefit of Company's successors and assigns, and may be enforced by any one or more of same, without need of any further agreement from me. (g) As used herein, references to restrictions used to protect the property and interests of the Company will be understood to include protection of the property and interests of any subsidiary, affiliate, or parent of the Company with which I have any material involvement during my employment with the Company. (h) I understand that the Company may elect to provide another party notice of this Agreement and an opinion about its applicability. While I reserve the right to also communicate my disagreement with such an opinion if I disagree, I recognize the Company's legitimate business interest in expressing its opinion and consent to it doing so if it believes such is necessary. I will not assert any claim that such conduct is legally actionable interference or otherwise impermissible regardless of whether or not this Agreement is later found to be enforceable in whole or in part.

13.    The laws of the State of Indiana will control the interpretation and application of this Agreement, without regard to any conflicts of law principles of Indiana or any other state to the contrary. I consent to the personal jurisdiction of courts in Marion County, over me and waive all rights to the contrary; and, the exclusive venue and forum for any legal action in a court of law arising from this Agreement shall be a court of competent jurisdiction located in Marion County, Indiana.

14.    In order to help avoid disputes and related litigation costs, during employment and for a period of six months thereafter, I will give the Company thirty (30) days advance written notice prior to accepting any position with a Competing Business and will engage in an interactive dialogue and exchange of information about the position I am considering accepting if requested to do so. I understand that the purpose of this notice obligation is to help avoid the cost of litigation that might otherwise be necessary to pursue discovery, and to explore negotiated restrictions that would protect the Company's legitimate business interests. Accordingly, if I fail to provide such notice I may be held responsible for costs of litigation and other consequential damages. I acknowledge that my obligations under this paragraph are in addition to the notice requirements under Paragraph 6.

I acknowledge that my employment with the Company is at will, and this Agreement does not constitute a contract for employment. This Agreement shall be considered made on the date signed by me below which shall be the effective date of this Agreement unless entering into this Agreement was or is a condition of my initial employment in which case the terms of this Agreement are understood to be operative upon the inception of my employment (whether reduced to writing on that specific date or not).

PROTECTIVE COVENANTS AGREEMENT - PAGE 5

**EMPLOYEE:**

_____
(signature)

Printed Name: _Eric Moody_

Date: _5/22/12_

**UNITED STATES
INFRASTRUCTURE CORPORATION**

By: _____

Its: _SVP_

PROTECTIVE COVENANTS AGREEMENT - PAGE 6

## EXHIBIT A

### Louisiana:

For a Louisiana resident, for so long as Employee resides in Louisiana and is subject to the laws of Louisiana, this Protective Covenants Agreement is modified as follows:

The enforcement of the restrictions in Sections 7 & 9 will be limited within the state of Louisiana to the Parishes in which Employee assisted Company in providing its products and services, as are indicated by circling below; provided, however, that nothing in Agreement may be construed to prohibit the enforcement of Sections 7 & 9 in accordance with their terms outside of Louisiana.

| | | | |
|---|---|---|---|
| Acadia | Allen | Ascension | Assumption |
| Avoyelles | Beauregard | Bienville | Bossier |
| Caddo | Calcasieu | Caldwell | Cameron |
| Catahoula | Claiborne | Concordia | De Soto |
| East Baton Rouge | East Carroll | East Feliciana | Evangeline |
| Franklin | Grant | Iberia | Iberville |
| Jackson | Jefferson | Jefferson Davis | Lafayette |
| Lafourche | La Salle | Lincoln | Livingston |
| Madison | Morehouse | Natchitoches | Orleans |
| Ouachita | Plaquemines | Pointe Coupee | Rapides |
| Red River | Richland | Sabine | St. Bernard |
| St. Charles | St. Helena | St. James | |
| St. John the Baptist | St. Landry | St. Martin | St. Mary |
| St. Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

### Nebraska:

For a Nebraska resident, for so long as Employee resides in Nebraska and is subject to the laws of Nebraska, this Protective Covenants Agreement is modified as follows:

Section 7 is limited to Company customers with which you had business dealings in the Look Back Period and excludes any entity who ceased being a customer at least six (6) months prior to your termination (due to no fault of you).

### Wisconsin:

For a Wisconsin resident, for so long as Employee resides in Wisconsin and is subject to the laws of Wisconsin, this Protective Covenants Agreement is modified as follows:

(a) the tolling language in Section 12(b) shall not apply.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 7**

**EXHIBIT B**

**Notice Regarding Invention Assignment**

1.      For an employee residing in Illinois, Kansas, or North Carolina, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.   Delaware Code Title 19 Section 805; Illinois 765ILCS1060/1-3, "Employees Patent Act"; Kansas Statutes Section 44-130; North Carolina General Statutes Article 10A, Chapter 66, Commerce and Business, Section 66-57.1.

2.      For an employee residing in Washington, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.   Washington Rev. Code, Title 49 RCW: Labor Regulations Chapter 49.44.140.

3.      For an employee residing in Minnesota, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, and (a) which does not relate (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by Employee    for    the    Company.    Minnesota    Statutes    13A    Section    181.78.

**PROTECTIVE COVENANTS AGREEMENT - PAGE 8**

# EXHIBIT D

EXECUTION COPY

## NON-QUALIFIED STOCK OPTION AGREEMENT
## OF
## LOCATE HOLDINGS, INC.

THIS AGREEMENT (the "Agreement") is entered into as of December 31, 2014 (the "Grant Date") by and between Locate Holdings, Inc., a Delaware corporation (the "Company"), and Travis Daniels, an employee, consultant or director of the Company or one of its Subsidiaries (hereinafter referred to as the "Optionee").

WHEREAS, the Board of Directors of the Company has approved the 2013 Stock Option Plan of Locate Holdings, Inc. (as it may be amended from time to time, the "Plan"), the terms of which are hereby incorporated by reference and made a part of this Agreement;

WHEREAS, the Committee appointed to administer the Plan pursuant to Section 6.1 of the Plan (the "Committee") has determined that it would be to the advantage and best interest of the Company and its shareholders to grant the Non-Qualified Stock Option provided for herein to the Optionee as an inducement to enter into or remain in the service of the Company or one of its Subsidiaries and as an incentive for increased efforts during such service, and has advised the Company thereof and instructed the undersigned officers to issue said Option; and

WHEREAS, the Optionee has entered into a Stockholders Agreement (as defined in the Plan) with the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

Whenever the following terms are used in this Agreement, they shall have the meaning specified below unless the context clearly indicates to the contrary.  Capitalized terms used in this Agreement and not defined below shall have the meaning given such terms in the Plan.  The singular pronoun shall include the plural, where the context so indicates.

Section 1.1   "Cash Equivalents" shall mean (a) securities issued or directly and fully guaranteed or insured by the full faith and credit of the United States government; (b) certificates of deposit or bankers acceptances with maturities of one year or less from institutions with at least $1 billion in capital and surplus and whose long-term debt is rated at least "A-1" by Moody's or the equivalent by Standard & Poor's; (c) commercial paper issued by a corporation rated at least "A-1" by Moody's or the equivalent by Standard & Poor's and in each case maturing within one year; and (d) investment funds investing at least ninety-five percent (95%) of their assets in cash or assets of the types described in clauses (a) through (c) above.

Section 1.2   "Cash Proceeds" shall mean actual cash proceeds received by the Principal Stockholders in respect of the Investment on or after the Closing Date (other than any cash proceeds received by a Principal Stockholder from an Affiliate thereof), including (a) any cash dividends, cash distributions or cash interest made or paid by the Company or any of its Subsidiaries in respect of the Investment (but excluding any management and similar fees or other amounts payable that are not directly attributable to the Investment) and (b) any cash or Cash Equivalents received for the disposal

of any portion of the Investment (including, without limitation, any cash or Cash Equivalents received by the Principal Stockholders upon the conversion of non-Cash Proceeds realized by the Principal Stockholders on the Investment).

Section 1.3   "Cause" shall mean the Company or any of its Subsidiaries having "Cause" to terminate the Optionee's employment or services, as such term is defined in any employment agreement between the Optionee and the Company or any of its Subsidiaries; *provided* that, in the absence of such an agreement containing such a definition, the Company or its Subsidiaries shall have "Cause" to terminate the Optionee's employment or services upon: (a) the Optionee's chronic alcoholism or drug addiction, (b) the Optionee's fraud, embezzlement, theft, dishonesty, or any intentional misappropriation of any material amount of money or other assets or property of the Company or any of its Affiliates by the Optionee, (c) the Optionee's intentional failure to perform, or gross negligence in the performance of, the Optionee's duties and responsibilities to the Company and its Affiliates which remains uncured ten (10) days after written notice of such failure specifying in reasonable detail the nature of such failure or negligence is given to the Optionee by the Company; *provided* that such cure period shall not be available for repeated or habitual offenses, (d) the Optionee's material breach (except where the breach is caused by the Optionee's Disability) of any of the terms of any written agreement between the Optionee and the Company or any of its Affiliates or any material written employment policy of the Company or any of its Affiliates, which breach remains uncured ten (10) days after written notice of such breach specifying in reasonable detail the nature of such breach is given to the Optionee by the Company; *provided* that such cure period shall not be available for repeated or habitual offenses, (e) commission by the Optionee of an act or omission that results in, or may reasonably be expected to result in, conviction of or entering of a plea *nolo contendere* by the Optionee to, a felony, or other crime involving fraud or moral turpitude, (f) the Optionee's material breach of the Optionee's fiduciary duties as an officer, trustee, or director of the Company or any of its Affiliates, (f) the Optionee's intentional refusal or failure to carry out a lawful directive of the Board or equivalent governing body of any of the Company's Affiliates or any officer of the Company or any of its Affiliates to whom the Optionee reports, which refusal or failure is not cured within ten (10) days after written notice of such refusal or failure is given to Executive; *provided* that such cure period shall not be available for repeated or habitual offenses, or (g) the Optionee's derogatory or disparaging statements concerning the Company or any of its Affiliates or their respective businesses made to individuals who are either not employed by or not a director of the Company or any of its Affiliates (including customers, prospective customers, lenders, competitors and industry sources), which results or will reasonably be expected to result in material harm to the Company or any of its Affiliates.

Section 1.4   "Change in Control" shall mean (a) the sale of all or substantially all of the assets of the Company, OPE USIC Holdings Inc. or any successor thereto ("USIC") or any wholly-owned subsidiary interposed between the Company and USIC (an "Intermediate Subsidiary") to any other person or entity (other than the Company, any of its Subsidiaries, any of the Principal Stockholders or any of their Affiliates, or any employee benefit plan maintained by the Company or any of its Subsidiaries), or (b) a change in beneficial ownership or control of the Company, USIC or any Intermediate Subsidiary effected through a transaction or series of transactions (other than an offering of Common Stock or other securities to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Subsidiaries, any of the Principal Stockholders or any of their Affiliates, or any employee benefit plan maintained by the Company or any of its Subsidiaries), directly or indirectly

acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company, USIC or any Intermediate Subsidiary possessing more than 50% of the total combined voting power of such entity's securities outstanding immediately after such acquisition.

Section 1.5    "Committee" shall have the meaning set forth in the Recitals hereto.

Section 1.6    "Company" shall have the meaning set forth in the preamble hereto.

Section 1.7    "Disability" shall mean the Board has made a good faith determination that the Optionee has become physically or mentally incapacitated or disabled such that the Optionee is unable to perform for the Company substantially the same services as the Optionee performed prior to incurring such incapacity or disability, and such incapacity or disability exists for an aggregate of four (4) calendar months in any twelve (12) month period.   In connection with making such determination, the Company, at its option and expense, shall be entitled to select and retain a physician to confirm the existence of such incapacity or disability, and the determination made by such physician shall be binding on the parties for the purposes of this Agreement.

Section 1.8    "Grant Date" shall have the meaning set forth in the preamble hereto.

Section 1.9    "Investment" shall mean the aggregate investment of funds by the Principal Stockholders in equity securities of the Company and its Subsidiaries (other than any purchase of equity securities by a Principal Stockholder at any time from an Affiliate thereof).

Section 1.10    "IPO Date" shall mean the effective date of an Initial Public Offering.

Section 1.11    "Measurement Date" shall mean each date on which the Principal Stockholders receive Cash Proceeds in connection with the Investment.

Section 1.12    "Noncompetition Period" shall mean the period of the Optionee's employment or services with the Company and the twelve (12) month period thereafter.

Section 1.13    "Option" shall mean the Non-Qualified Stock Option to purchase Common Stock granted under this Agreement.

Section 1.14    "Optionee" shall have the meaning set forth in the preamble hereto.

Section 1.15    "Performance-Vesting Option" shall have the meaning set forth in Section 3.1(b).

Section 1.16    "Plan" shall have the meaning set forth in the Recitals hereto.

Section 1.17    "Principal Stockholder MOIC" shall mean (a) as of a Measurement Date, the "multiple of invested capital" received by the Principal Stockholders on the Investment as of such Measurement Date, which shall be equal to the ratio of (i) the amount of all actual Cash Proceeds received by the Principal Stockholders with respect to the Investment on or prior to such Measurement Date, to (ii) the amount of the Investment made on or prior to such Measurement Date; or (b) as of the IPO Date, the "multiple of invested capital" at which the Principal Stockholders' Investment is valued as of the IPO Date, which shall be equal to the ratio of (i) the sum of (x) the

3

amount of all actual Cash Proceeds received by the Principal Stockholders with respect to the Investments on or prior to the IPO Date and (y) the aggregate value of the equity securities of the Company held by the Principal Stockholders immediately following the IPO Date, as determined based on the Initial Public Offering price per share, to (ii) the amount of the Investment on or prior to the IPO Date.

Section 1.18   "Proprietary Information" shall mean (a) the name or address of any customer, supplier or affiliate of the Company or any information concerning the transactions or relations of any customer, supplier or affiliate of the Company or any of its shareholders; (b) any information concerning any product, service, technology or procedure offered or used by the Company, or under development by or being considered for use by the Company; (c) any information relating to marketing or pricing plans or methods, capital structure, or any business or strategic plans of the Company; (d) any inventions, innovations, trade secrets or other items covered by Section 4.5; and (v) any other information which the Board has determined by resolution and communicated to the Optionee in writing to be proprietary information for purposes hereof; *provided, however,* that "Proprietary information" shall not include any information that is or becomes generally known to the public other than through actions of the Optionee in violation of the restrictive covenants set forth in Article IV.

Section 1.19   "Time-Vesting Option" shall have the meaning set forth in Section 3.1(a).

## ARTICLE II.
## GRANT OF OPTION

Section 2.1   Grant of Option.  In consideration of the Optionee's agreement to enter into or remain in the employ of, consultancy to or other service relationship with the Company or one of its Subsidiaries, and for other good and valuable consideration, as of the Grant Date, the Company irrevocably grants to the Optionee the Option to purchase any part or all of an aggregate of 125 shares of Common Stock upon the terms and conditions set forth in the Plan and this Agreement.

Section 2.2   Option Subject to Plan.  The Option granted hereunder is subject to the terms and provisions of the Plan, including without limitation, Article V and Sections 7.1, 7.2 and 7.3 thereof.

Section 2.3   Option Price.  The purchase price of the shares of Common Stock covered by the Option shall be $722.18 per share (without commission or other charge), which is not less than 100% of the Fair Market Value of a share of Common Stock as of the Grant Date.

## ARTICLE III.
## EXERCISABILITY

Section 3.1   Commencement of Exercisability.

(a)   Subject to Sections 3.1(c) and 3.3, 50% of the Option (the "Time-Vesting Option") shall become exercisable in five equal and cumulative installments; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its

4

Subsidiaries (and no Termination of Services occurs) from the Grant Date through such date, as follows:

        (i)      The first installment shall consist of 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2015;

        (ii)      The second installment shall consist of an additional 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2016;

        (iii)      The third installment shall consist of an additional 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2017;

        (iv)      The fourth installment shall consist of an additional 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2018; and

        (v)      The fifth installment shall consist of the remaining 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2019.

Notwithstanding the foregoing, upon the occurrence of a Change in Control of the Company, the Time-Vesting Option shall become fully vested and exercisable immediately prior to the effective date of such Change in Control; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through the consummation of such Change in Control.

        (b)      Subject to Sections 3.1(c) and 3.3, 50% of the Option (the "Performance-Vesting Option") shall be eligible to become exercisable; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through the applicable Measurement Date, as follows:

        (i)      25% of the shares covered by the Option (50% of the Performance-Vesting Option) shall become vested and exercisable on the first Measurement Date as of which the Principal Stockholder MOIC equals or exceeds 2.0; and

        (ii)      The remaining 25% of the shares covered by the Option (50% of the Performance-Vesting Option) shall become vested and exercisable on the first Measurement Date as of which the Principal Stockholder MOIC equals or exceeds 3.0.

For the avoidance of doubt, upon the occurrence of a Change in Control of the Company, the Performance-Vesting Option shall become vested and exercisable immediately prior to the effective date of such Change in Control to the extent that the applicable Principal Stockholder MOIC targets are achieved in connection with such Change in Control; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through the consummation of such Change in Control.

(c)     No portion of the Option which is unexercisable at Termination of Services for any reason shall thereafter become exercisable (and such unexercisable portion shall be forfeited as of the date of such Termination of Services).  No portion of the Performance-Vesting Option which is unexercisable immediately following the receipt of all consideration by the Principal Stockholders in connection with the disposal by the Principal Stockholders of their entire remaining Investment (taking into account any vesting that occurs pursuant to Section 3.1(b) on any Measurement Date occurring in connection with such disposal) shall thereafter become exercisable (and such unexercisable portion shall be forfeited as of such receipt).

Section 3.2     Duration of Exercisability.  The installments provided for in Section 3.1 are cumulative.  Each such installment which becomes exercisable pursuant to Section 3.1 shall remain exercisable until it becomes unexercisable.

Section 3.3     Expiration of Option.  The Option may not be exercised to any extent by anyone after the first to occur of the following events:

(a)     The tenth anniversary of the Grant Date; or

(b)     The 90th day following the date of the Optionee's Termination of Services for any reason other than (i) termination by the Company for Cause or (ii) due to the Optionee's death, retirement or Disability; or

(c)     Notwithstanding the provisions of Section 3.1, in the event of the Optionee's Termination of Services by the Company for Cause, the Optionee shall, immediately prior to such Termination of Services (and subject to such Termination of Services), forfeit the Option, whether vested or unvested; or

(d)     In the case of a Termination of Services due to the Optionee's death, retirement or Disability, the expiration of one year from the date of the Optionee's Termination of Services; or

(e)     The date the Optionee first violates any of the restrictive covenants set forth in Article IV.

Section 3.4     Partial Exercise.  Any exercisable portion of the Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable; *provided, however,* that each partial exercise shall be for not less than 10 shares of Common Stock and shall be for whole shares of Common Stock only.

Section 3.5     Exercise of Option.  The exercise of the Option shall be governed by the terms of this Agreement and the terms of the Plan, including, without limitation, the provisions of Article V of the Plan.

## ARTICLE IV.
## RESTRICTIVE COVENANTS

Section 4.1     Non-Competition.  The Optionee acknowledges that in the course of the Optionee's employment with the Company the Optionee will become familiar with trade secrets and

other confidential information of the Company and that the Optionee's services will be of special, unique and extraordinary value to the Company. Therefore, the Optionee agrees that, during the Noncompetition Period, the Optionee shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with any business of the Company within the United States and any other geographical area in which the Company then engages in business or engaged in business at any time during the Optionee's employment with the Company. Nothing herein shall prohibit the Optionee from being a passive owner of not more than two percent (2%) of the outstanding stock of any class of a corporation which is publicly traded so long as the Optionee has no direct or indirect active participation in the business of such corporation.

Section 4.2    Non-Solicitation. During the Noncompetition Period, the Optionee shall not directly or indirectly (a) induce or attempt to induce any employee of the Company to terminate such employment, or in any way interfere with the employee relationship between the Company and any such employee; (b) hire any person who is, or, at any time during the 18-month period immediately prior to the date of the Optionee's termination of employment, was, an employee of the Company; or (c) induce or attempt to induce any person having a business relationship with the Company to cease doing business with the Company or interfere materially with the relationship between any such person and the Company.

Section 4.3    Proprietary Information. The Optionee agrees that the Optionee shall not use for the Optionee's own purpose or for the benefit of any person or entity other than the Company or its shareholders or affiliates, nor shall the Optionee otherwise disclose to any individual or entity at any time while the Optionee is employed by the Company or thereafter any Proprietary Information of the Company unless such disclosure (a) has been authorized by the Board; (b) is reasonably required within the course and scope of the Optionee's employment with the Company; or (c) is required by law, a court of competent jurisdiction or a governmental or regulatory agency.

Section 4.4    Surrender of Records. The Optionee agrees that the Optionee shall not retain and shall promptly surrender to the Company all correspondence, memoranda, files, manuals, financial, operating or marketing records, magnetic tape, or electronic or other media of any kind which may be in the Optionee's possession or under the Optionee's control or accessible to the Optionee which contain any Proprietary Information.

Section 4.5    Inventions and Patents. The Optionee agrees that all inventions, innovations, trade secrets, patents and processes in any way relating, directly or indirectly, to the Company's business developed by the Optionee alone or in conjunction with others at any time during the Optionee's employment by the Company shall belong to the Company. The Optionee will use the Optionee's best efforts to perform all actions reasonably requested by the Board to establish and confirm such ownership by the Company.

Section 4.6    Non-Disparagement. The Optionee agrees not to disparage the Company, any of its products or practices, any of its directors, officers, agents, representatives, employees or affiliates, either orally or in writing, at any time; *provided* that the Optionee shall not be required to make any untruthful statement or to violate any law.

Section 4.7   Definition of the Company.   For purposes of this Article IV, the term "Company" shall include the Company and any and all of its parents, subsidiaries, joint ventures and affiliated entities as the same may exist from time to time.

Section 4.8   Enforcement.   The parties hereto agree that the duration and area for which the covenants set forth in this Article IV are to be effective are reasonable.   In the event that any court or arbitrator determines that the time period or the area, or both of them, are unreasonable and that any of the covenants are to that extent unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable.   The parties intend that this Article IV will be deemed to be a series of separate covenants, one for each and every county of each and every state of the United States of America.   The Optionee agrees that damages are an inadequate remedy for any breach of the covenants in this Article IV and that the Company will, whether or not it is pursuing any potential remedies at law, be entitled to equitable relief in the form of preliminary and permanent injunctions without bond or other security upon any actual or threatened breach of this Article IV.

## ARTICLE V.
## OTHER PROVISIONS

Section 5.1   Not a Contract of Employment or Services.   Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue in the employ or engagement of the Company or any of its Subsidiaries or shall interfere with or restrict in any way the rights of the Company or its Subsidiaries, which are hereby expressly reserved, to discharge the Optionee at any time for any reason whatsoever, with or without Cause, except as may otherwise be provided by any written agreement entered into by and between the Company and the Optionee.

Section 5.2   Shares Subject to Plan and Stockholders Agreement; Entire Agreement.   The Optionee acknowledges that any shares acquired upon exercise of the Option are subject to the terms of the Plan and the Stockholders Agreement.   The terms of this Agreement are intended by the parties to be the final expression of their agreement with respect to the subject matter hereof and may not be contradicted by evidence of any prior or contemporaneous agreement.   The parties further intend that this Agreement (together with the Plan and the Stockholders Agreement) shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

Section 5.3   Construction.   This Agreement shall be administered, interpreted and enforced under the internal laws of the State of Delaware, without regard to the principles of conflicts of law thereof, or principles of conflicts of law of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 5.4   Conformity to Securities Laws.   The Optionee acknowledges that the Plan is intended to conform to the extent necessary with all provisions of the Securities Act and the Exchange Act and any and all regulations and rules promulgated thereunder by the Securities and Exchange Commission, including without limitation Rule 16b-3.   Notwithstanding anything herein to the contrary, the Plan shall be administered, and the Option is granted and may be exercised, only in such a manner as to conform to such laws, rules and regulations.   To the extent permitted by

8

applicable law, the Plan and this Agreement shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

Section 5.5   Amendment, Suspension and Termination.   The Option may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Committee or the Board; *provided* that the Optionee's consent shall be required with respect to any such action unless (a) the Committee determines that the action, taking into account any related action, would not materially and adversely affect the Optionee or (b) such change is permitted under Section 7.1 of the Plan or Section 5.6 or 5.7 of this Agreement.

Section 5.6   Section 409A.   To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder.   Notwithstanding any provision of this Agreement to the contrary, in the event that the Committee determines that this Option may be subject to Section 409A of the Code, the Committee may adopt such amendments to this Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions that the Committee determines are necessary or appropriate to (a) exempt the Option from Section 409A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Option, or (b) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance and thereby avoid the application of penalty taxes under such Section 409A.   Notwithstanding anything herein to the contrary, in no event shall any liability for failure to comply with the requirements of Section 409A of the Code be transferred from the Optionee or any other Person to the Company or any of its Affiliates, employees or agents pursuant to the terms of this Agreement or otherwise.

Section 5.7   Stockholder Approval.

(a)   Except as otherwise provided in subsection (b) below, in the event that it shall be determined that any right to receive the Option, payment or other benefit under this Agreement (including, without limitation, the acceleration of the vesting and/or exercisability of the Option and taking into account the effect of this Section) or any employment agreement by and between the Optionee and the Company, to or for the benefit of the Optionee (the "Payments"), would, in whole or part when aggregated with any other right, payment or benefit to or for the Optionee under all other agreements or benefit plans of the Company, be nondeductible by the Company (or other person making such payment or providing such benefit) as a result of Section 280G of the Code and/or would subject the Optionee to the excise tax imposed by Section 4999 of the Code (the "Excise Tax") then, to the extent necessary to make the Payments deductible and to exempt the Payments from the Excise Tax (but only to such extent and after taking into account any reduction in the Payments relating to Section 280G of the Code under any other plan, arrangement or agreement), the Option or any other right, payment or benefit under this Agreement shall not become exercisable, vested or paid.

(b)   Notwithstanding any other provision of this Agreement, the provisions of subsection (a) above shall not apply to reduce the Payments if the Payments that would otherwise be nondeductible under Section 280G of the Code and/or would subject the Optionee to the Excise Tax are disclosed to and approved by the Company's stockholders in accordance with Section 280G(b)(5)(B) of the Code and the Department of Treasury regulations thereunder.

      (c)      The Company shall use its best efforts to prepare and deliver to its stockholders the disclosure required by Section 280G(b)(5)(B) of the Code with respect to the Payments and to obtain the approval of the Company's stockholders pursuant to subsection (b) above.

[signature pages follow]

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto as of the date first above written.

LOCATE HOLDINGS, INC.

By: _____

Its: _____

*Signature Page to Stock Option Agreement*

OPTIONEE

Travis Daniels

Residence Address:

6065 Bremen Ct   Unit 12
Johnston, IA   50131

Optionee's Social Security Number:

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

## SPOUSAL
## CONSENT

The Optionee's spouse, if any, is fully aware of, understands and fully consents and agrees to the provisions of this Agreement and the Stockholders Agreement and their binding effect upon any marital or community property interests he or she may now or hereafter own with respect to the Options issued to the Optionee, and agrees that the termination of his or her and the Optionee's marital relationship for any reason shall not have the effect of removing any Options otherwise subject to this Agreement from coverage hereunder or under the Stockholders Agreement and that his or her awareness, understanding, consent and agreement are evidenced by his or her signature below.  Further, the undersigned acknowledges that he or she has been advised to and given the opportunity to consult its own independent attorneys and advisors prior to signing this Spousal Consent, and has done so to the extent the undersigned deemed appropriate.

Candice Daniels
**Spouse's Name**

*Signature Page to Stock Option Agreement*

# EXHIBIT E

EXECUTION COPY

### NON-QUALIFIED STOCK OPTION AGREEMENT
### OF
### LOCATE HOLDINGS, INC.

THIS AGREEMENT (the "Agreement") is entered into as of October 3, 2013 (the "Grant Date") by and between Locate Holdings, Inc., a Delaware corporation (the "Company"), and Brian Hanna, an employee, consultant or director of the Company or one of its Subsidiaries (hereinafter referred to as the "Optionee").

WHEREAS, the Board of Directors of the Company has approved the 2013 Stock Option Plan of Locate Holdings, Inc. (as it may be amended from time to time, the "Plan"), the terms of which are hereby incorporated by reference and made a part of this Agreement;

WHEREAS, the Committee appointed to administer the Plan pursuant to Section 6.1 of the Plan (the "Committee") has determined that it would be to the advantage and best interest of the Company and its shareholders to grant the Non-Qualified Stock Option provided for herein to the Optionee as an inducement to enter into or remain in the service of the Company or one of its Subsidiaries and as an incentive for increased efforts during such service, and has advised the Company thereof and instructed the undersigned officers to issue said Option; and

WHEREAS, the Optionee has entered into a Stockholders Agreement (as defined in the Plan) with the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

### ARTICLE I.
### DEFINITIONS

Whenever the following terms are used in this Agreement, they shall have the meaning specified below unless the context clearly indicates to the contrary. Capitalized terms used in this Agreement and not defined below shall have the meaning given such terms in the Plan. The singular pronoun shall include the plural, where the context so indicates.

Section 1.1    "Cash Equivalents" shall mean (a) securities issued or directly and fully guaranteed or insured by the full faith and credit of the United States government; (b) certificates of deposit or bankers acceptances with maturities of one year or less from institutions with at least $1 billion in capital and surplus and whose long-term debt is rated at least "A-1" by Moody's or the equivalent by Standard & Poor's; (c) commercial paper issued by a corporation rated at least "A-1" by Moody's or the equivalent by Standard & Poor's and in each case maturing within one year; and (d) investment funds investing at least ninety-five percent (95%) of their assets in cash or assets of the types described in clauses (a) through (c) above.

Section 1.2    "Cash Proceeds" shall mean actual cash proceeds received by the Principal Stockholders in respect of the Investment on or after the Closing Date (other than any cash proceeds received by a Principal Stockholder from an Affiliate thereof), including (a) any cash dividends, cash distributions or cash interest made or paid by the Company or any of its Subsidiaries in respect of the Investment (but excluding any management and similar fees or other amounts payable that are not directly attributable to the Investment) and (b) any cash or Cash Equivalents received for the disposal

NY\5913241.1

of any portion of the Investment (including, without limitation, any cash or Cash Equivalents received by the Principal Stockholders upon the conversion of non-Cash Proceeds realized by the Principal Stockholders on the Investment).

Section 1.3   "Cause" shall mean the Company or any of its Subsidiaries having "Cause" to terminate the Optionee's employment or services, as such term is defined in any employment agreement between the Optionee and the Company or any of its Subsidiaries; *provided* that, in the absence of such an agreement containing such a definition, the Company or its Subsidiaries shall have "Cause" to terminate the Optionee's employment or services upon: (a) the Optionee's chronic alcoholism or drug addiction, (b) the Optionee's fraud, embezzlement, theft, dishonesty, or any intentional misappropriation of any material amount of money or other assets or property of the Company or any of its Affiliates by the Optionee, (c) the Optionee's intentional failure to perform, or gross negligence in the performance of, the Optionee's duties and responsibilities to the Company and its Affiliates which remains uncured ten (10) days after written notice of such failure specifying in reasonable detail the nature of such failure or negligence is given to the Optionee by the Company; *provided* that such cure period shall not be available for repeated or habitual offenses, (d) the Optionee's material breach (except where the breach is caused by the Optionee's Disability) of any of the terms of any written agreement between the Optionee and the Company or any of its Affiliates or any material written employment policy of the Company or any of its Affiliates, which breach remains uncured ten (10) days after written notice of such breach specifying in reasonable detail the nature of such breach is given to the Optionee by the Company; *provided* that such cure period shall not be available for repeated or habitual offenses, (e) commission by the Optionee of an act or omission that results in, or may reasonably be expected to result in, conviction of or entering of a plea *nolo contendere* by the Optionee to, a felony, or other crime involving fraud or moral turpitude, (f) the Optionee's material breach of the Optionee's fiduciary duties as an officer, trustee, or director of the Company or any of its Affiliates, (f) the Optionee's intentional refusal or failure to carry out a lawful directive of the Board or equivalent governing body of any of the Company's Affiliates or any officer of the Company or any of its Affiliates to whom the Optionee reports, which refusal or failure is not cured within ten (10) days after written notice of such refusal or failure is given to Executive; *provided* that such cure period shall not be available for repeated or habitual offenses, or (g) the Optionee's derogatory or disparaging statements concerning the Company or any of its Affiliates or their respective businesses made to individuals who are either not employed by or not a director of the Company or any of its Affiliates (including customers, prospective customers, lenders, competitors and industry sources), which results or will reasonably be expected to result in material harm to the Company or any of its Affiliates.

Section 1.4   "Change in Control" shall mean (a) the sale of all or substantially all of the assets of the Company, OPE USIC Holdings Inc. or any successor thereto ("USIC") or any wholly-owned subsidiary interposed between the Company and USIC (an "Intermediate Subsidiary") to any other person or entity (other than the Company, any of its Subsidiaries, any of the Principal Stockholders or any of their Affiliates, or any employee benefit plan maintained by the Company or any of its Subsidiaries), or (b) a change in beneficial ownership or control of the Company, USIC or any Intermediate Subsidiary effected through a transaction or series of transactions (other than an offering of Common Stock or other securities to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Subsidiaries, any of the Principal Stockholders or any of their Affiliates, or any employee benefit plan maintained by the Company or any of its Subsidiaries), directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of

securities of the Company, USIC or any Intermediate Subsidiary possessing more than 50% of the total combined voting power of such entity's securities outstanding immediately after such acquisition.

Section 1.5    "Committee" shall have the meaning set forth in the Recitals hereto.

Section 1.6    "Company" shall have the meaning set forth in the preamble hereto.

Section 1.7    "Disability" shall mean the Board has made a good faith determination that the Optionee has become physically or mentally incapacitated or disabled such that the Optionee is unable to perform for the Company substantially the same services as the Optionee performed prior to incurring such incapacity or disability, and such incapacity or disability exists for an aggregate of four (4) calendar months in any twelve (12) month period. In connection with making such determination, the Company, at its option and expense, shall be entitled to select and retain a physician to confirm the existence of such incapacity or disability, and the determination made by such physician shall be binding on the parties for the purposes of this Agreement.

Section 1.8    "Grant Date" shall have the meaning set forth in the preamble hereto.

Section 1.9    "Investment" shall mean the aggregate investment of funds by the Principal Stockholders in equity securities of the Company and its Subsidiaries (other than any purchase of equity securities by a Principal Stockholder at any time from an Affiliate thereof).

Section 1.10    "IPO Date" shall mean the effective date of an Initial Public Offering.

Section 1.11    "Measurement Date" shall mean each date on which the Principal Stockholders receive Cash Proceeds in connection with the Investment.

Section 1.12    "Noncompetition Period" shall mean the period of the Optionee's employment or services with the Company and the twelve (12) month period thereafter.

Section 1.13    "Option" shall mean the Non-Qualified Stock Option to purchase Common Stock granted under this Agreement.

Section 1.14    "Optionee" shall have the meaning set forth in the preamble hereto.

Section 1.15    "Performance-Vesting Option" shall have the meaning set forth in Section 3.1(b).

Section 1.16    "Plan" shall have the meaning set forth in the Recitals hereto.

Section 1.17    "Principal Stockholder MOIC" shall mean (a) as of a Measurement Date, the "multiple of invested capital" received by the Principal Stockholders on the Investment as of such Measurement Date, which shall be equal to the ratio of (i) the amount of all actual Cash Proceeds received by the Principal Stockholders with respect to the Investment on or prior to such Measurement Date, to (ii) the amount of the Investment made on or prior to such Measurement Date; or (b) as of the IPO Date, the "multiple of invested capital" at which the Principal Stockholders' Investment is valued as of the IPO Date, which shall be equal to the ratio of (i) the sum of (x) the amount of all actual Cash Proceeds received by the Principal Stockholders with respect to the Investments on or prior to the IPO Date and (y) the aggregate value of the equity securities of the

Company held by the Principal Stockholders immediately following the IPO Date, as determined based on the Initial Public Offering price per share, to (ii) the amount of the Investment on or prior to the IPO Date.

Section 1.18   "Proprietary Information" shall mean (a) the name or address of any customer, supplier or affiliate of the Company or any information concerning the transactions or relations of any customer, supplier or affiliate of the Company or any of its shareholders; (b) any information concerning any product, service, technology or procedure offered or used by the Company, or under development by or being considered for use by the Company; (c) any information relating to marketing or pricing plans or methods, capital structure, or any business or strategic plans of the Company; (d) any inventions, innovations, trade secrets or other items covered by Section 4.5; and (v) any other information which the Board has determined by resolution and communicated to the Optionee in writing to be proprietary information for purposes hereof; *provided, however,* that "Proprietary information" shall not include any information that is or becomes generally known to the public other than through actions of the Optionee in violation of the restrictive covenants set forth in Article IV.

Section 1.19   "Time-Vesting Option" shall have the meaning set forth in Section 3.1(a).

## ARTICLE II.
## GRANT OF OPTION

Section 2.1   Grant of Option.  In consideration of the Optionee's agreement to enter into or remain in the employ of, consultancy to or other service relationship with the Company or one of its Subsidiaries, and for other good and valuable consideration, as of the Grant Date, the Company irrevocably grants to the Optionee the Option to purchase any part or all of an aggregate of 300 shares of Common Stock upon the terms and conditions set forth in the Plan and this Agreement.

Section 2.2   Option Subject to Plan.  The Option granted hereunder is subject to the terms and provisions of the Plan, including without limitation, Article V and Sections 7.1, 7.2 and 7.3 thereof.

Section 2.3   Option Price.  The purchase price of the shares of Common Stock covered by the Option shall be $722.18 per share (without commission or other charge), which is not less than 100% of the Fair Market Value of a share of Common Stock as of the Grant Date.

## ARTICLE III.
## EXERCISABILITY

Section 3.1   Commencement of Exercisability.

(a)   Subject to Sections 3.1(c) and 3.3, 50% of the Option (the "Time-Vesting Option") shall become exercisable in five equal and cumulative installments; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through such date, as follows:

(i)   The first installment shall consist of 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2014;

(ii)    The second installment shall consist of an additional 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2015;

(iii)    The third installment shall consist of an additional 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2016;

(iv)    The fourth installment shall consist of an additional 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2017; and

(v)    The fifth installment shall consist of the remaining 10% of the shares covered by the Option (20% of the Time-Vesting Option) and shall become exercisable on July 10, 2018.

Notwithstanding the foregoing, upon the occurrence of a Change in Control of the Company, the Time-Vesting Option shall become fully vested and exercisable immediately prior to the effective date of such Change in Control; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through the consummation of such Change in Control.

(b)    Subject to Sections 3.1(c) and 3.3, 50% of the Option (the "Performance-Vesting Option") shall be eligible to become exercisable; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through the applicable Measurement Date, as follows:

(i)    25% of the shares covered by the Option (50% of the Performance-Vesting Option) shall become vested and exercisable on the first Measurement Date as of which the Principal Stockholder MOIC equals or exceeds 2.0; and

(ii)    The remaining 25% of the shares covered by the Option (50% of the Performance-Vesting Option) shall become vested and exercisable on the first Measurement Date as of which the Principal Stockholder MOIC equals or exceeds 3.0.

For the avoidance of doubt, upon the occurrence of a Change in Control of the Company, the Performance-Vesting Option shall become vested and exercisable immediately prior to the effective date of such Change in Control to the extent that the applicable Principal Stockholder MOIC targets are achieved in connection with such Change in Control; *provided* that the Optionee remains continuously employed or engaged in active service by the Company or any of its Subsidiaries (and no Termination of Services occurs) from the Grant Date through the consummation of such Change in Control.

(c)    No portion of the Option which is unexercisable at Termination of Services for any reason shall thereafter become exercisable (and such unexercisable portion shall be forfeited as of the date of such Termination of Services).  No portion of the Performance-Vesting Option which is unexercisable immediately following the receipt of all consideration by the Principal Stockholders in connection with the disposal by the Principal Stockholders of their entire remaining Investment (taking into account any vesting that occurs pursuant to Section 3.1(b) on any

Measurement Date occurring in connection with such disposal) shall thereafter become exercisable (and such unexercisable portion shall be forfeited as of such receipt).

Section 3.2    Duration of Exercisability.  The installments provided for in Section 3.1 are cumulative.  Each such installment which becomes exercisable pursuant to Section 3.1 shall remain exercisable until it becomes unexercisable.

Section 3.3    Expiration of Option.  The Option may not be exercised to any extent by anyone after the first to occur of the following events:

(a)    The tenth anniversary of the Grant Date; or

(b)    The 90th day following the date of the Optionee's Termination of Services for any reason other than (i) termination by the Company for Cause or (ii) due to the Optionee's death, retirement or Disability; or

(c)    Notwithstanding the provisions of Section 3.1, in the event of the Optionee's Termination of Services by the Company for Cause, the Optionee shall, immediately prior to such Termination of Services (and subject to such Termination of Services), forfeit the Option, whether vested or unvested; or

(d)    In the case of a Termination of Services due to the Optionee's death, retirement or Disability, the expiration of one year from the date of the Optionee's Termination of Services; or

(e)    The date the Optionee first violates any of the restrictive covenants set forth in Article IV.

Section 3.4    Partial Exercise.  Any exercisable portion of the Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable; *provided, however,* that each partial exercise shall be for not less than 10 shares of Common Stock and shall be for whole shares of Common Stock only.

Section 3.5    Exercise of Option.  The exercise of the Option shall be governed by the terms of this Agreement and the terms of the Plan, including, without limitation, the provisions of Article V of the Plan.

## ARTICLE IV.
## RESTRICTIVE COVENANTS

Section 4.1    Non-Competition.  The Optionee acknowledges that in the course of the Optionee's employment with the Company the Optionee will become familiar with trade secrets and other confidential information of the Company and that the Optionee's services will be of special, unique and extraordinary value to the Company.  Therefore, the Optionee agrees that, during the Noncompetition Period, the Optionee shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with any business of the Company within the United States and any other geographical area in which the Company then engages in business or engaged in business at any time during the Optionee's employment with the Company.  Nothing herein shall prohibit the Optionee from being a passive

owner of not more than two percent (2%) of the outstanding stock of any class of a corporation which is publicly traded so long as the Optionee has no direct or indirect active participation in the business of such corporation.

Section 4.2   Non-Solicitation.   During the Noncompetition Period, the Optionee shall not directly or indirectly (a) induce or attempt to induce any employee of the Company to terminate such employment, or in any way interfere with the employee relationship between the Company and any such employee; (b) hire any person who is, or, at any time during the 18-month period immediately prior to the date of the Optionee's termination of employment, was, an employee of the Company; or (c) induce or attempt to induce any person having a business relationship with the Company to cease doing business with the Company or interfere materially with the relationship between any such person and the Company.

Section 4.3   Proprietary Information.   The Optionee agrees that the Optionee shall not use for the Optionee's own purpose or for the benefit of any person or entity other than the Company or its shareholders or affiliates, nor shall the Optionee otherwise disclose to any individual or entity at any time while the Optionee is employed by the Company or thereafter any Proprietary Information of the Company unless such disclosure (a) has been authorized by the Board; (b) is reasonably required within the course and scope of the Optionee's employment with the Company; or (c) is required by law, a court of competent jurisdiction or a governmental or regulatory agency.

Section 4.4   Surrender of Records.   The Optionee agrees that the Optionee shall not retain and shall promptly surrender to the Company all correspondence, memoranda, files, manuals, financial, operating or marketing records, magnetic tape, or electronic or other media of any kind which may be in the Optionee's possession or under the Optionee's control or accessible to the Optionee which contain any Proprietary Information.

Section 4.5   Inventions and Patents.   The Optionee agrees that all inventions, innovations, trade secrets, patents and processes in any way relating, directly or indirectly, to the Company's business developed by the Optionee alone or in conjunction with others at any time during the Optionee's employment by the Company shall belong to the Company. The Optionee will use the Optionee's best efforts to perform all actions reasonably requested by the Board to establish and confirm such ownership by the Company.

Section 4.6   Non-Disparagement.   The Optionee agrees not to disparage the Company, any of its products or practices, any of its directors, officers, agents, representatives, employees or affiliates, either orally or in writing, at any time; *provided* that the Optionee shall not be required to make any untruthful statement or to violate any law.

Section 4.7   Definition of the Company.   For purposes of this Article IV, the term "Company" shall include the Company and any and all of its parents, subsidiaries, joint ventures and affiliated entities as the same may exist from time to time.

Section 4.8   Enforcement.   The parties hereto agree that the duration and area for which the covenants set forth in this Article IV are to be effective are reasonable. In the event that any court or arbitrator determines that the time period or the area, or both of them, are unreasonable and that any of the covenants are to that extent unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable. The parties intend that this

Article IV will be deemed to be a series of separate covenants, one for each and every county of each and every state of the United States of America. The Optionee agrees that damages are an inadequate remedy for any breach of the covenants in this Article IV and that the Company will, whether or not it is pursuing any potential remedies at law, be entitled to equitable relief in the form of preliminary and permanent injunctions without bond or other security upon any actual or threatened breach of this Article IV.

## ARTICLE V.
## OTHER PROVISIONS

Section 5.1    Not a Contract of Employment or Services. Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue in the employ or engagement of the Company or any of its Subsidiaries or shall interfere with or restrict in any way the rights of the Company or its Subsidiaries, which are hereby expressly reserved, to discharge the Optionee at any time for any reason whatsoever, with or without Cause, except as may otherwise be provided by any written agreement entered into by and between the Company and the Optionee.

Section 5.2    Shares Subject to Plan and Stockholders Agreement; Entire Agreement. The Optionee acknowledges that any shares acquired upon exercise of the Option are subject to the terms of the Plan and the Stockholders Agreement. The terms of this Agreement are intended by the parties to be the final expression of their agreement with respect to the subject matter hereof and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties further intend that this Agreement (together with the Plan and the Stockholders Agreement) shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

Section 5.3    Construction. This Agreement shall be administered, interpreted and enforced under the internal laws of the State of Delaware, without regard to the principles of conflicts of law thereof, or principles of conflicts of law of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 5.4    Conformity to Securities Laws. The Optionee acknowledges that the Plan is intended to conform to the extent necessary with all provisions of the Securities Act and the Exchange Act and any and all regulations and rules promulgated thereunder by the Securities and Exchange Commission, including without limitation Rule 16b-3. Notwithstanding anything herein to the contrary, the Plan shall be administered, and the Option is granted and may be exercised, only in such a manner as to conform to such laws, rules and regulations. To the extent permitted by applicable law, the Plan and this Agreement shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

Section 5.5    Amendment, Suspension and Termination. The Option may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Committee or the Board; *provided* that the Optionee's consent shall be required with respect to any such action unless (a) the Committee determines that the action, taking into account any related action, would not materially and adversely affect the Optionee or (b) such change is permitted under Section 7.1 of the Plan or Section 5.6 or 5.7 of this Agreement.

Section 5.6    Section 409A.  To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder.  Notwithstanding any provision of this Agreement to the contrary, in the event that the Committee determines that this Option may be subject to Section 409A of the Code, the Committee may adopt such amendments to this Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions that the Committee determines are necessary or appropriate to (a) exempt the Option from Section 409A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Option, or (b) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance and thereby avoid the application of penalty taxes under such Section 409A.  Notwithstanding anything herein to the contrary, in no event shall any liability for failure to comply with the requirements of Section 409A of the Code be transferred from the Optionee or any other Person to the Company or any of its Affiliates, employees or agents pursuant to the terms of this Agreement or otherwise.

Section 5.7    Stockholder Approval.

(a)      Except as otherwise provided in subsection (b) below, in the event that it shall be determined that any right to receive the Option, payment or other benefit under this Agreement (including, without limitation, the acceleration of the vesting and/or exercisability of the Option and taking into account the effect of this Section) or any employment agreement by and between the Optionee and the Company, to or for the benefit of the Optionee (the "Payments"), would, in whole or part when aggregated with any other right, payment or benefit to or for the Optionee under all other agreements or benefit plans of the Company, be nondeductible by the Company (or other person making such payment or providing such benefit) as a result of Section 280G of the Code and/or would subject the Optionee to the excise tax imposed by Section 4999 of the Code (the "Excise Tax") then, to the extent necessary to make the Payments deductible and to exempt the Payments from the Excise Tax (but only to such extent and after taking into account any reduction in the Payments relating to Section 280G of the Code under any other plan, arrangement or agreement), the Option or any other right, payment or benefit under this Agreement shall not become exercisable, vested or paid.

(b)      Notwithstanding any other provision of this Agreement, the provisions of subsection (a) above shall not apply to reduce the Payments if the Payments that would otherwise be nondeductible under Section 280G of the Code and/or would subject the Optionee to the Excise Tax are disclosed to and approved by the Company's stockholders in accordance with Section 280G(b)(5)(B) of the Code and the Department of Treasury regulations thereunder.

(c)      The Company shall use its best efforts to prepare and deliver to its stockholders the disclosure required by Section 280G(b)(5)(B) of the Code with respect to the Payments and to obtain the approval of the Company's stockholders pursuant to subsection (b) above.

[signature page follows]

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto as of the date first above written.

LOCATE HOLDINGS, INC.

By: _____

Michael B. Stayton
President & CEO

Its: _____

OPTIONEE

_____
Brian Hanna

Residence Address:

3650 Cottage Grove Ave SE
Cedar Rapids, Iowa 52403

Optionee's Social Security Number:

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

EXECUTION COPY

**SIGNATURE PAGE
TO THE MANAGEMENT STOCKHOLDERS AGREEMENT
OF LOCATE HOLDINGS, INC.**

By execution of this signature page, Brian Hanna hereby agrees to become a party to, be bound by the obligations of, and receive the benefits of, that certain Management Stockholders Agreement of Locate Holdings, Inc. dated as of July 10, 2013 by and among Locate Holdings, Inc., a Delaware corporation (the "Company"), the stockholders of the Company signatory thereto and certain other parties named therein, as amended from time to time thereafter.

_____
Brian Hanna

Residence Address:

58850 Cottage Grove Ave SE
Cedar Rapids Iowa
52403

Accepted:

**LOCATE HOLDINGS, INC.**

By: _____
Name: Michael Stayton
Title:   President and CEO

*Signature Page to Joinder to Management Stockholders Agreement of Locate Holdings, Inc.*

STATE OF INDIANA    )      IN THE MARION CIRCUIT/SUPERIOR COURT
                     ) SS:  CIVIL DIVISION, ROOM01 **16 11 PL 0399 93**
COUNTY OF MARION    )      CAUSE NO. _____

USIC, LLC; USIC LOCATING SERVICES,  )
LLC; and LOCATE HOLDINGS, INC.     )
                             )
          Plaintiffs,         )
                             )
   v.                          )
                             )
BRENT COFFIELD, TRAVIS DANIELS,  )
BRIAN HANNA, ZACH MATNEY, ERIC  )
MOODY, TOM ORTH, and         )
CONSOLIDATED INFRASTRUCTURE   )
GROUP, INC.                 )
                             )
         Defendants.       )

## SUMMONS

**TO DEFENDANT:**    **BRENT COFFIELD**
                    **5759 McPherson Ave.**
                    **St. Louis, MO 63112**

       You are hereby notified that you have been sued by the person named as Plaintiff and in the Court indicated above.

       The nature of the suit against you is stated in the Complaint, which is attached to this Summons. It also states the relief sought or the demand made against you by the Plaintiff.

       An answer or other appropriate response in writing to the Complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail) or Judgment by default may be rendered against you for the relief demanded by Plaintiff.

       If you have a claim for relief against Plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

                                       *Myla A. Eldridge*
                                    CLERK OF THE MARION CIRCUIT COURT

Dated: _____

                     Clerk, Marion County Court    NOV 0 9 2016

Paul A. Wolfla, No. 24709-49
FAEGRE BAKER DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204
(317)-237-0300
Attorneys for Plaintiff

The following manner of service of Summons is hereby designated:
\_\_\_\_\_  Registered or Certified Mail
\_\_\_\_\_  Service at place of employment, to-wit: _____
\_\_X\_\_  Service on individual.
\_\_\_\_\_  Service on registered agent at above address
\_\_.\_\_  Service by Publication
\_\_\_\_\_  Other service. (Specify)

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 20___, I mailed a copy of this Summons and a copy of the Complaint to the Defendant _____ by _____ mail, requesting a return receipt, at the address furnished by the Plaintiff.

Dated:_____                    _____

                                                                        Clerk Marion County Courts

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the summons and a copy of the Complaint mailed to the Defendant, was accepted on the _____ day of _____, 20____.

I hereby certify that the attached return receipt was received by me on the _____ day of _____, 20___, showing that the summons and a copy of the Complaint was returned not accepted.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the Complaint mailed to the Defendant, was accepted by _____ (age) _____ on behalf of said Defendant on the _____ day of _____, 20____.

                                                                        _____

                                                                        Clerk Marion County Courts

## SHERIFF'S RETURN OF SERVICE OF SUMMONS

I hereby certify that I have served the within Summons: (1) By delivering a copy of the Summons and a copy of the Complaint to the Defendant on the ___ day of _____, 20____.

(2) By leaving a copy of the Summons and a copy of the Complaint:
        (a)  at the dwelling place or usual place of abode of the Defendant
        (b)  with a person of suitable age and discretion residing therein, namely _____
and by mailing a copy of the Summons to the Defendant, by first class mail, to the address listed on the Summons, the last known address of the Defendant.

                                                                        _____

                                                                        Sheriff of Marion County, Indiana

By:_____

2

| STATE OF INDIANA | ) | IN THE MARION CIRCUIT/SUPERIOR COURT |
|---|---|---|
| | ) SS: | CIVIL DIVISION, ROOM _____ |
| COUNTY OF MARION | ) | CAUSE NO. ____ 49D01 16 11 PL 039993 |

| | |
|---|---|
| USIC, LLC; USIC LOCATING SERVICES, LLC; and LOCATE HOLDINGS, INC. | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| BRENT COFFIELD, TRAVIS DANIELS, BRIAN HANNA, ZACH MATNEY, ERIC MOODY, TOM ORTH, and CONSOLIDATED INFRASTRUCTURE GROUP, INC. | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## SUMMONS

TO DEFENDANT:   **CONSOLIDATED INFRASTRUCTURE GROUP, INC.**
**c/o CT CORPORATION SYSTEM**
**5601 South 59th Street**
**Lincoln, NE 68516**

You are hereby notified that you have been sued by the person named as Plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the Complaint, which is attached to this Summons. It also states the relief sought or the demand made against you by the Plaintiff.

An answer or other appropriate response in writing to the Complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail) or Judgment by default may be rendered against you for the relief demanded by Plaintiff.

If you have a claim for relief against Plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____        *Myla a. Eldridge*
CLERK OF THE MARION CIRCUIT COURT

_____
Clerk, Marion County Court        NOV 0 9 2016

Paul A. Wolfla, No. 24709-49
FAEGRE BAKER DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204
(317)-237-0300
Attorneys for Plaintiff

The following manner of service of Summons is hereby designated:
__X__   Registered or Certified Mail
_____   Service at place of employment, to-wit:_____
_____   Service on individual.
_____   Service on registered agent at above address
_____   Service by Publication
_____   Other service. (Specify)

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 20___, I mailed a copy of this Summons and a copy of the Complaint to the Defendant _____ by _____ mail, requesting a return receipt, at the address furnished by the Plaintiff.

Dated:_____          _____

                                                            Clerk Marion County Courts

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the summons and a copy of the Complaint mailed to the Defendant, was accepted on the _____ day of _____, 20____.

I hereby certify that the attached return receipt was received by me on the _____ day of _____, 20___, showing that the summons and a copy of the Complaint was returned not accepted.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the Complaint mailed to the Defendant, was accepted by _____ (age) _____ on behalf of said Defendant on the _____ day of _____, 20____.

                                                  _____

                                                            Clerk Marion County Courts

## SHERIFF'S RETURN OF SERVICE OF SUMMONS

I hereby certify that I have served the within Summons: (1) By delivering a copy of the Summons and a copy of the Complaint to the Defendant on the ____ day of _____, 20____.

(2) By leaving a copy of the Summons and a copy of the Complaint:
      (a) at the dwelling place or usual place of abode of the Defendant
      (b) with a person of suitable age and discretion residing therein, namely _____
and by mailing a copy of the Summons to the Defendant, by first class mail, to the address listed on the Summons, the last known address of the Defendant.

                                                  _____

                                                            Sheriff of Marion County, Indiana

By:_____

2

STATE OF INDIANA )        IN THE MARION CIRCUIT/SUPERIOR COURT
                ) SS:  CIVIL DIVISION, ROOM _____
COUNTY OF MARION )        CAUSE NO. _____

|  |  |
|---|---|
| USIC, LLC; USIC LOCATING SERVICES, LLC; and LOCATE HOLDINGS, INC. | ) ) ) |
|  | ) |
| Plaintiffs, | ) ) |
|  | ) |
| v. | ) ) |
|  | ) |
| BRENT COFFIELD, TRAVIS DANIELS, BRIAN HANNA, ZACH MATNEY, ERIC MOODY, TOM ORTH, and CONSOLIDATED INFRASTRUCTURE GROUP, INC. | ) ) ) ) ) |
|  | ) |
| Defendants. | ) |

*49D01 16 11 PL 039993*

*5:55pm  11-16-2016*

Process Server: *JD Towe*
Time: *3:20pm*  Date: *11-15-2016*
Address of Serve: *3850 Cottage Gr Ave SE*
*Cedar Rapids, IA*
Person Being Served: *Brian Hanna*
[✓] Personal       [ ] Substitute
[ ] Posted         [ ] Corporate

## SUMMONS

TO DEFENDANT:    **BRIAN HANNA**
                        **3850 Cottage Grove Ave SE**
                        **Cedar Rapids, IA 52403**

      You are hereby notified that you have been sued by the person named as Plaintiff and in the Court indicated above.

      The nature of the suit against you is stated in the Complaint, which is attached to this Summons. It also states the relief sought or the demand made against you by the Plaintiff.

      An answer or other appropriate response in writing to the Complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail) or Judgment by default may be rendered against you for the relief demanded by Plaintiff.

      If you have a claim for relief against Plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

*Myla A. Eldridge*
CLERK OF THE MARION CIRCUIT COURT

Dated: _____    _____
                                 Clerk, Marion County Court  *NOV 08 2016*

Paul A. Wolfla, No. 24709-49
FAEGRE BAKER DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204
(317)-237-0300
Attorneys for Plaintiff

The following manner of service of Summons is hereby designated:
_____ Registered or Certified Mail
_____ Service at place of employment, to-wit:_____
__X__ Service on individual.
_____ Service on registered agent at above address
_____ Service by Publication
_____ Other service. (Specify)

# INDIANA COMMERCIAL COURT

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | CIVIL DIVISION, ROOM ____ |
| COUNTY OF MARION | ) | CAUSE NO. ____ 49D01 16 11 PL 03 99 93 |

USIC, LLC; USIC LOCATING SERVICES,
LLC; and LOCATE HOLDINGS, INC.

JURY DEMANDED

     Plaintiffs,

VS.

BRENT COFFIELD, TRAVIS DANIELS,
BRIAN HANNA, ZACH MATNEY,
ERIC MOODY, TOM ORTH, and
CONSOLIDATED INFRASTRUCTURE
GROUP, INC.

    Defendants.



FILED

(182)   NOV 0 9 2016

Myla An Eldridge
CLERK OF THE MARION CIRCUIT COURT

## NOTICE IDENTIFYING COMMERCIAL COURT DOCKET CASE

    The undersigned states that this case is a Commercial Court Docket Case eligible for assignment to the Commercial Court Docket pursuant to Rule 2 of the Interim Commercial Court Rules.

    Pursuant to Rule 4 of the Interim Commercial Court Rules, the undersigned requests the Clerk of Court assign this case to the Commercial Court Docket.

                      Respectfully submitted,

                      Paul A. Wolfla

Paul A. Wolfla       IN Bar #24709-49
Mark L. Shope      IN Bar #30850-49
FAEGRE BAKER DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204
(317) 237-0300
(317) 237-1000 fax
Paul.Wolfla@FaegreBD.com
Mark.Shope@FaegreBD.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Notice is included in a package of materials containing a summons and complaint that is being provided to a process server on this 9th day of November, for personal service upon the following:

Brent Coffield
5759 McPherson Ave.
St.Louis, MO 63112

Zachary Matney
1056 Highland Ave.
Corning, IA 50841

Travis Daniels
10508 Catalina Dr.
Johnston, IA 50131

Eric Moody
16058 Redman Ave.
Omaha, NE 68116

Brian Hanna
3850 Cottage Grove Ave. SE
Cedar Rapids, IA 52403

Tom Orth
2121 J Lawson Blvd.
Orlando, FL 32824

The undersigned hereby certifies that a copy of the foregoing Notice is included in a package of materials containing a summons and complaint has been served this 9th day of November, 2016, by United States Certified Mail upon the following:

Consolidated Infrastructure Group, Inc.
c/o CT Corporation System
5601 South 59th Street
Lincoln, NE 68516

*Attorneys for Plaintiffs USIC, LLC., USIC Locating Services, LLC., and Locate Holdings, Inc.*

_Paul A. Wolf_

US.108930638.01